## LOEWE v. LAWLOR.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 389. Argued December 4, 5, 1907.—Decided February 3, 1908.

After the Circuit Court of Appeals has certified questions to this court and this court has issued its writ of certiorari requiring the whole record to be sent up, it devolves upon this court under § 6 of the Judiciary Act of 1891, to decide the whole matter in controversy in the same manner as if it had been brought here for review by writ of error or appeal.

The Anti-Trust Act of July 2, 1890, 26 Stat. 209, has a broader application than the prohibition of restraints of trade unlawful at common law.

It prohibits any combination which essentially obstructs the free flow of commerce between the States, or restricts, in that regard, the liberty of a trader to engage in business; and this includes restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of interstate trade except on conditions that the combination imposes.

A combination may be in restraint of interstate trade and within the meaning of the Anti-Trust Act although the persons exercising the restraint may not themselves be engaged in interstate trade, and some of the means employed may be acts within a State and individually beyond the scope of Federal authority, and operate to destroy intrastate trade as interstate trade, but the acts must be considered as a whole, and if the purposes are to prevent interstate transportation the plan is open to condemnation under the Anti-Trust Act of July 2, 1890. *Swift* v. *United States*, 196 U. S. 375.

The Anti-Trust Act of July 2, 1890, makes no distinction between classes. Organizations of farmers and laborers were not exempted from its operation, notwithstanding the efforts which the records of Congress show were made in that direction.

A combination of labor organizations and the members thereof, to compel a manufacturer whose goods are almost entirely sold in other States, to unionize his shops and on his refusal so to do to boycott his goods and prevent their sale in States other than his own until such time as the resulting damage forces him to comply with their demands, is, under the conditions of this case, a combination in restraint of interstate trade or commerce within the meaning of the Anti-Trust Act of July 2, 1890, and the manufacturer may maintain an action for threefold damages under § 7 of that act.

THE facts are stated in the opinion.

*Mr. James M. Beck* and *Mr. Daniel Davenport* for plaintiffs in error:

The complaint must be considered as an entirety. A combination so great in scope, and complex in its operations necessarily contains elements, which in and by themselves are either innocent or beyond Federal jurisdiction. The complaint must stand, if, *as a whole*, it substantially sets forth a combination, whose purpose and effect is to restrain interstate trade. It is impossible for the plaintiffs to set forth all the defendants' secret operations with definiteness and particularity. *Swift* v. *United States*, 196 U. S. 375.

The Anti-Trust Act is not limited to restraints of interstate

trade or commerce that are unreasonable in their nature, but embraces all direct restraints imposed by any combination, conspiracy or monopoly upon such trade or commerce. *Northern Securities Case*, 193 U. S. 197, 331. The burden is on whoever seeks to read for their own benefit an exception into this sweeping and all-comprehensive language.

It matters not that the defendants were members of labor unions and were not themselves engaged in carrying on any form of interstate trade; nor that their operations also embraced restraint of trade within a State; nor that they did not, in addition to the other steps taken by them to effect their purpose, resort to the actual seizure of the plaintiffs' hats while in transit or otherwise physically obstruct their transportation; nor that they combined to restrain and destroy the plaintiffs' interstate trade as a means to compel them to "unionize" their factory, as a step in their broader conspiracy to force all hat manufacturers to do so; these circumstances were urged upon the trial court by the defendants, and it erroneously attached some importance to them in reaching its conclusion.

Congress has power to declare and has declared, that all interstate trade shall be absolutely free from all direct restriction through combinations, and every such combination stands condemned in the express terms of the statute. A combination to restrain and prevent the plaintiffs from selling and disposing of their product to customers in other States and to restrain and prevent such customers in other States from buying them, is a combination in restraint of interstate trade as much as a combination to prevent by physical violence their transportation from State to State. It does not matter that it also embraces trade wholly within a State. Indeed, if the destruction of trade within a State is the means resorted to, to prevent the customers in that State from buying from the manufacturer or dealer in another State, it is prohibited by the Sherman Anti-Trust law.

Liability under the Anti-Trust law does not depend upon any physical obstruction of interstate transportation. Com-

merce is something more than mere transportation. It also consists in traffic and in that even larger field of interstate communication to which Marshall gave the all-embracing term of commercial "intercourse."

The field of interstate commerce includes all essential acts antecedent to physical transportation and subsequent thereto, where necessary to preserve the free flow of such commerce. *Swift & Co.* v. *United States*, 196 U. S. 375.

It is equally well settled that the Federal power does not end with the mere physical delivery of the article transported in the State of destination. The Federal power is coextensive with the subject on which it acts and cannot be stopped at the external boundary of the State, but must enter the interior and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered. *Leisy* v. *Hardin*, 135 U. S. 100. See also *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489.

In *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, an agreement which, prior to any act of transportation, limited the prices at which pipe could be sold after transportation, was held by this court to be a violation of the Anti-Trust Act. In *Chattanooga Foundry Co.* v. *City of Atlanta*, 203 U. S. 390, this court sustained a recovery under § 7 of the Sherman Anti-Trust law in a suit growing out of the combination which was declared invalid in the *Addyston Pipe case* (*supra*).

The court clearly recognized that to prevent a dealer from making any sale to a customer in another State, and therefore preventing altogether the possible transportation of the merchandise, was as much within the law as to enhance the price of a commodity which had actually been purchased and shipped.

Similarly in the case at bar the avowed object and necessary result of the labor combination was to prevent altogether purchases from the plaintiffs by their customers in other States. The total prevention of interstate sales, whereby no act of interstate transportation takes place, is as much within the statute

as a physical restraint of transportation when it actually commences.

In the case of *Montague* v. *Lowry*, 193 U. S. 38, this court held that an obstruction to the purchase of tiles, a fact antecedent to physical transportation, was within the prohibition of the Sherman Anti-Trust law.

Under the pleadings in the case at bar, the court must conclude that there was an existing interstate traffic between the plaintiff and citizens of other States and that for the direct purpose of destroying such interstate traffic the defendants combined not merely to prevent him from manufacturing articles then and there intended for transportation beyond the State, but also to prevent the vendees from either reselling the hats, which they had imported from Connecticut, or from further negotiating with the plaintiffs for the purchase and incidental transportation of such hats from Connecticut to the various places of destination. It is true that some of the means whereby the interstate traffic was to be destroyed, were, when detached, acts within a State and that some of them were in themselves and apart from their obvious purpose and necessary effect, acts beyond the scope of Federal authority. The acts must be considered as a whole and defendants' contention in this case, that because the means, which they adopted to destroy the plaintiffs' interstate traffic, operated at one end before physical transportation commenced and at the other end after physical transportation ended, is wholly unimportant, if the purposes of the combination were to prevent any interstate transportation at all.

Defendants' claim is not supported by the *Stock Yards cases* (*Hopkins* v. *United States*, 171 U. S. 578, and *Anderson* v. *United States*, 171 U. S. 604).

In those cases it was held that there was no purpose to obstruct or restrain interstate commerce, that the combination related to purely local business.

The combination as an unreasonable one and criminal at common law falls under the opinion of Mr. Justice Brewer in

the *Northern Securities case*, which possibly foreshadows a ruling by this court that the statute extends only to those cases in which the restraint is unreasonable, or unlawful at common law. American and English Decisions in Equity, Vol. 7, page 562; *Martin* v. *McFall*, 55 Atl. Rep. 465; *Callan* v. *Wilson*, 127 U. S. 540; *Arthur* v. *Oakes*, 63 Fed. Rep. 310.

To the same effect are *Toledo A. A. & N. M. R. Co.* v. *Penn. Co.*, 54 Fed. Rep. 730, per TAFT, J., and the following cases: *Purington* v. *Hinchcliff*, 219 Illinois, 159, 167; *Chicago W. & V. Coal Co.* v. *People*, 214 Illinois, 421; *Doremus* v. *Hennessy*, 176 Illinois, 608; *State* v. *Donaldson*, 3 Vroom, 151; *State* v. *Stewart*, 59 Vermont, 293; *Sherry* v. *Perkins*, 147 Massachusetts, 212; *Crump* v. *Com.*, 84 Virginia, 927; *Erdman* v. *Mitchell*, 207 Pa. St. 79; *Gatzow* v. *Bruening*, 106 Wisconsin, 1; *Old Dominion S. S. Co.* v. *McKenna*, 30 Fed. Rep. 48; *Reg* v. *Rowlands*, 17 A. and E. (N. S.) 671, 685; *Loewe* v. *California State Federation of Labor*, 139 Fed. Rep. 71.

Members of a combination or conspiracy under the Anti-Trust law are not exempt because they are not engaged in interstate transportation.

They contend that the Sherman law is inapplicable because the defendants are not themselves engaged in interstate commerce.

Congress did not provide that one class in the community could combine to restrain interstate trade and another class could not. It had no respect for persons. It made no distinction between classes. It provided that "every" contract, combination or conspiracy in restraint of trade was illegal.

The legislative history of the Sherman Anti-Trust law clearly shows that its applicability to combinations of labor as well as of capital was not an oversight.

After the Sherman law was enacted bills were introduced in the 52d Congress, H. R. 6,640, § 1; 55th Congress, Senate 1,546, § 8; H. R. 10,539, § 7; 56th Congress, H. R. 11,667, § 7; 57th Congress, S., 649, § 7; H. R. 14,947, § 7, to amend the Sherman Anti-Trust law so that it would be inapplicable to labor

organizations, and while one of these (H. R. 10,539, § 7) passed the House in the 56th Congress, none ever became a law.

Congress, therefore, has refused to exempt labor unions from the comprehensive provisions of the Sherman law against combinations in restraint of trade, and this refusal is the more significant, as it followed the recognition by the courts that the Sherman Anti-Trust law applied to labor organizations. *United States* v. *Workingmen's Amalgamated Council*, 54 Fed. Rep. 994; *Waterhouse* v. *Comer*, 55 Fed. Rep. 149; *United States* v. *Elliott*, 62 Fed. Rep. 801; *Thomas* v. *Cincinnati Ry. Co.*, 62 Fed. Rep. 803; *In re Debs*, 158 U. S. 564; *United States* v. *Freight Association*, 166 U. S. 356.

In the following cases the combination was held valid: *United States* v. *Knight*, 156 U. S. 1; *Hopkins* v. *United States*, 171 U. S. 578; *Anderson* v. *United States*, 171 U. S. 604; *Bement* v. *Harrow*, 186 U. S. 70; *Chicago Board* v. *Christie*, 198 U. S. 236; *Cincinnati Packet Co.* v. *Bay*, 200 U. S. 179.

In the following cases the combination was held invalid: *In re Debs*, 158 U. S. 564; *United States* v. *Trans-Missouri Ass'n*, 166 U. S. 290; *United States* v. *Joint Traffic Ass'n*, 171 U. S. 505; *United States* v. *Addyston Pipe Co.*, 175 U. S. 211; *Montague* v. *Lowry*, 193 U. S. 38; *United States* v. *Northern Securities*, 193 U. S. 197; *United States* v. *Swift*, 196 U. S. 375; *City of Atlanta* v. *Chattanooga*, 203 U. S. 390.

*Mr. John Kimberly Beach* and *Mr. John H. Light*, with whom *Mr. Robert DeForest* and *Mr. Howard W. Taylor* were on the brief, for defendants in error:

On general principles the complaint states no cause of action which falls within the Federal jurisdiction over controversies between citizens of the same State.

As there is no suggestion of any sale or attempt to sell the plaintiffs' hats in original packages, the manufacture of the plaintiffs' hats in Connecticut, and their disposition in the State of destination after delivery to the consignee, are matters which are exclusively within state power of regulation, even

though such regulation might necessarily diminish the volume of the plaintiffs' interstate business. *Coe* v. *Erroll*, 116 U. S. 517, 525; *Kidd* v. *Pierson*, 128 U. S. 1, 24.

And see the *License Cases*, 5 How. 504, and *Leisy* v. *Hardin*, 135 U. S. 116.

Federal jurisdiction cannot include combinations of persons whose operations restrain interstate commerce only indirectly, and incidentally to the direct effect of the combination on the manufacture of the plaintiffs' hats in Connecticut, or on the disposition of such hats in other States after the breaking up of the original package of importation. A combination of persons to restrict the manufacture of the plaintiffs' hats in Connecticut, or to restrict their sale in California after the original package of importation has been broken is a combination which, on general principles, is to be dealt with by the several States, respectively, and not by the United States. *Hopkins* v. *United States*, 171 U. S. 578, 594; *United States* v. *Knight*, 156 U. S. 1.

In the cases relied upon by the plaintiffs in error there has been present the element of a direct restraint by legislation, contract or physical interference, of some transaction or operation admittedly belonging to interstate, as distinguished from intrastate, commerce; and it has been held that the Federal jurisdiction was not ousted because such legislation, contract or interference also affected other operations and transactions admittedly belonging to intrastate commerce.

The converse of this proposition must be equally true, namely, that if the direct restraint of legislation contract or interference is confined to operations admittedly belonging to intrastate commerce, the state jurisdiction will not be ousted, because such legislation, contract or interference also affects other operations relating to the same general transaction, which admittedly belong to interstate commerce.

The complaint fairly alleges a diversion of plaintiffs' trade by inducing customers in another State not to buy his goods. So long as it is understood that the means employed for diverting this trade are means operating on the customer and not

operating directly upon the course of commerce, it is immaterial whether the means employed be lawful or unlawful.

It is plain from the whole complaint that the defendants have no ultimate design upon interstate commerce as such, and that their real design is to unionize the plaintiffs' factory, or to bring all hat factories in the United States under union conditions. True, that fact will not protect them, if in the pursuit of such design they employ means which directly obstruct the course of interstate commerce; but it will protect them unless the use of such means is specifically alleged.

Again, the conspiracy stated is not among persons who are themselves engaged in interstate commerce, and therefore its operation on the business of a non-member is not incidental to its internal effect upon interstate commerce among the members of the combination. *Montague* v. *Lowry*, 193 U. S. 38; *Chattanooga Foundry* v. *City of Atlanta*, 203 U. S. 390; the *Beef Trust Case*, 195 U. S. 375, distinguished. In these cases there was a sufficient proof of an agreement to regulate the interstate commerce of the parties to the combination, and it was held that other allegations of domestic transactions in furtherance of such main purpose were properly pleaded as part of the general scheme.

The complaint states no cause of action under the Sherman Act as construed by this court, including those reviewed in the *Northern Securities Co. Cases*, 193 U. S. 197, as follows: *United States* v. *Knight*, 156 U. S. 1; *Hopkins* v. *United States*, 171 U. S. 578; *Addyston Pipe & Steel Case*, 175 U. S. 211; *Anderson* v. *United States*, 171 U. S. 604; *Montague* v. *Lowry*, 193 U. S. 27; *Swift* v. *United States*, 195 U. S. 375; *Chattanooga Foundry* v. *Atlanta*, 203 U. S. 391.

Taking these cases together, they furnish the logical rule that a combination within the act must either appear to be a combination whose object is in restraint of interstate commerce, or if the combination be formed for some other object, that some one of the means employed must appear to be in itself a direct restraint upon interstate commerce.

The design of the defendants is not to restrain interstate commerce, but to unionize plaintiffs' factory, and none of the means for carrying out this design constitutes in itself a direct restraint upon interstate commerce. Strikes in local factories, the publication of false statements as to the plaintiffs' attitude toward organized labor, etc., and the restraint of domestic sales by retail dealers in different States, are not in themselves in restraint of interstate commerce. The case at bar cannot be distinguished in principle from the *Anderson Case*, 171 U. S. 602, in which it was decided that a boycott of the business of a person engaged in interstate commerce was not in direct restraint of interstate commerce, when it was entered into for the purpose of compelling the individual in question to join the yard traders' association. In principle, that decision must control the question whether a boycott of the plaintiffs' business for the purpose of compelling them to unionize their factory is in direct restraint of interstate commerce.

By leave of court, *Mr. Thomas Care Spelling* filed a brief herein on behalf of The American Federation of Labor and others.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court:

This was an action brought in the Circuit Court for the District of Connecticut under § 7 of the Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209, claiming threefold damages for injuries inflicted on plaintiffs by a combination or conspiracy declared to be unlawful by the act.

Defendants filed a demurrer to the complaint, assigning general and special grounds. The demurrer was sustained as to the first six paragraphs, which rested on the ground that the combination stated was not within the Sherman Act, and this rendered it unnecessary to pass upon any other questions in the case; and upon plaintiffs declining to amend their complaint the court dismissed it with costs. 148 Fed. Rep. 924; and see 142 Fed. Rep. 216; 130 Fed. Rep. 633.

The case was then carried by writ of error to the Circuit Court of Appeals for the Second Circuit, and that court, desiring the instruction of this court upon a question arising on the writ of error, certified that question to this court. The certificate consisted of a brief statement of facts, and put the question thus: "Upon this state of facts can plaintiffs maintain an action against defendants under section 7 of the Anti-Trust Act of July 2, 1890?"

After the case on certificate had been docketed here plaintiffs in error applied, and defendants in error joined in the application, to this court to require the whole record and cause to be sent up for its consideration. The application was granted and the whole record and cause being thus brought before this court it devolved upon the court, under § 6 of the Judiciary Act of 1891, to "decide the whole matter in controversy in the same manner as if it had been brought there for review by writ of error or appeal."

The case comes up, then, on complaint and demurrer, and we give the complaint in the margin.[1]

---

[1] The complaint alleged that the defendants were residents of the District of Connecticut and that complainants resided in Danbury, in that district, were copartners and located and doing business as manufacturers and sellers of hats there; that they had "a factory for the making of hats, for sale by them in the various States of the Union, and have for many years employed, at said factory, a large number of men in the manufacture and sale of said hats, and have invested in that branch of their business a large amount of capital, and in their business of selling the product of their factory and filling orders for said hats, have built up and established a large interstate trade, employing more than two hundred and thirty (230) persons in making and annually selling hats of a value exceeding four hundred thousand ($400,000) dollars.

"4. The plaintiffs, deeming it their right to manage and conduct their business without interference from individuals or associations not connected therewith, have for many years maintained the policy of refusing to suffer or permit any person or organization to direct or control their said business, and in consequence of said policy, have conducted their said business upon the broad and patriotic principle of not discriminating against any person seeking employment because of his being or not being connected with any labor or other organization, and have refused to enter into agreement with any person or organization whereby the rights and privileges, either of them-

The question is whether upon the facts therein averred and admitted by the demurrer this action can be maintained under the Anti-Trust Act.

The first, second and seventh sections of that act are as follows:

selves or any employé, would be jeopardized, surrendered to or controlled by said person or organization, and have believed said policy, which was and is well known to the defendants, to be absolutely necessary to the successful conduct of their said business and the welfare of their employés.

"5. The plaintiffs, for many years, have been and now are engaged in trade and commerce among the several States of the Union, in selling and shipping almost the whole of the product of their said factory by common carriers, from said Danbury to wholesale dealers residing and doing business in each of the States of Maine, Massachusetts, Rhode Island, New York, New Jersey, Pennsylvania, Maryland, Virginia, Ohio, Illinois, Michigan, Wisconsin, Missouri, Nebraska, Arkansas, California and other States, to the amount of many hundreds of thousands of dollars, and in sending agents with samples from said Danbury into and through each of said States to visit said wholesale dealers at their places of business in said several States, and solicit and procure from them orders for said hats, to be filled by hats to be shipped from their said factory at said Danbury, by common carriers to said wholesale dealers, to be by them paid for after the delivery thereof at their several places of business.

"6. On July 25, 1902, the amount of capital invested by the plaintiffs in said business of making and selling hats, approximated one hundred and thirty thousand dollars, and the value of the hats annually sold and shipped by them in previous years, to said dealers in States other than Connecticut, exceeded four hundred thousand dollars, while the value of hats sold by them in the State of Connecticut did not exceed ten thousand dollars.

"7. On July 25, 1902, the plaintiffs had made preparations to do a large and profitable business with said wholesale dealers in other States, and the condition of their business was such as to warrant the full belief that the ensuing year would be the most successful in their experience. Their factory was then running to its full capacity in filling a large number of orders from such wholesale dealers in other States. They were then employing about one hundred and sixty men in the making and finishing departments, a large number in the trimming and other departments, whose work was dependent upon the previous work of the makers and finishers, and they then had about one hundred and fifty dozens of hats in process of manufacture, and in such condition as to be perishable and ruined if work was stopped upon them.

"8. The plaintiffs then were and now are almost wholly dependent upon the sale and shipments of hats as aforesaid, to said dealers in States other than Connecticut, to keep their said factory running and to dispose of its product and their capital in said business profitably employed, and the restraint, curtailment and destruction of their said trade and commerce with

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such

their said customers in said States other than Connecticut, by the combination, conspiracy and acts of the defendants, as hereinafter set forth, have been and now are of serious damage to the property and business of the plaintiffs, as hereinafter set forth.

"9. The individual defendants, named in this writ, are all members of a combination or association of persons, styling themselves The United Hatters of North America, and said combination includes more than nine thousand persons, residing in the several States of Massachusetts, Connecticut, New York, New Jersey, Pennsylvania, Indiana, Illinois, Missouri, California, and the Province of Ontario in the Dominion of Canada. The said combination is subdivided into twenty subcombinations, each of which is by themselves styled a local union of The United Hatters of North America. Six of said subcombinations are in the State of Connecticut, and known as local Unions 1 and 2, 10 and 11, and 15 and 16 of The United Hatters of North America, and have an aggregate membership of more than three thousand persons residing in the State of Connecticut.

"10. Said combination of persons, collectively known as The United Hatters of North America, owns, controls, edits, publishes, and issues a paper styled The Journal of the United Hatters of North America, in which are published reports of many of the acts of its agents, hereinafter mentioned, which circulates widely among its members and the public, and which affords a ready, convenient, powerful and effective vehicle for the dissemination of information to its members and the public as to boycotts declared and pushed by them, and of the acts and measures of its members and agents for carrying such boycotts into effect, and was so used by them in connection with the acts of the defendants hereinafter set forth.

"11. Said combination owns and absolutely controls the use of a certain label or distinguishing mark, which it styles the Union Label of the United Hatters of North America, which mark, when so used by them, affords to them a ready, convenient and effective instrument and means of boycotting the hats of any manufacturer against whom they may desire to use it for that purpose.

"12. The defendants in this suit are also all members of a combination or association of persons calling themselves and known as The American Federation of Labor, which includes more than a million and four hundred thousand members residing in the several States and Territories of the Union, and in the Dominion of Canada, and in all the places in the several States, where the wholesale dealers in hats, hereinbefore mentioned, and their customers reside, and do business. Said combination is subdivided in subordinate groups, or combinations, comprising one hundred and ten national and international unions and combinations, of which the said combinations of persons

contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

styling themselves The United Hatters of North America is one, composed of twelve thousand local unions, twenty-eight State federations or combinations, more than five hundred central labor unions or combinations, and more than two thousand local unions or combinations, which are not included in the above-mentioned national and international combinations.

"13. Said combination of persons collectively known as The American Federation of Labor owns, controls, edits, publishes, and issues a paper or magazine called The American Federationist, which it declares to be its official organ and mouthpiece, which has a very wide circulation among its members and others, and which affords a ready, convenient, powerful and effective vehicle and instrument for the dissemination of information, as to persons, their products and manufactures, boycotted or to be boycotted, by its members, and as to measures adopted and statements to be published, detrimental to such persons and to the sale of their manufactures and for boycotting such persons, their manufactures, and said paper has been and now is constantly used, printed and distributed for said purposes among its members and the public and was so used by the defendants and their confederates in boycotting the products of the firm of F. Berg & Co., of Orange, New Jersey, and H. H. Roelofs & Co., of Philadelphia, Pa., hat manufacturers, to their very great injury and until the said firms successively yielded to their demands in pursuance of the general scheme of the defendants hereinafter set forth.

"14. The persons united in said combination, known as The American Federation of Labor, including the persons in said subcombination known as The United Hatters of North America, constantly employ more than one thousand agents in the States and Territories of the United States, to push, enforce and carry into effect all boycotts declared by the said members, including those in aid of the combined scheme, purpose and effort hereinafter stated, to force all the manufacturers of fur hats in the United States, including the plaintiffs, to unionize their factories by restraining and destroying their interstate trade and commerce, as hereinafter stated, all of which said agents act under the immediate supervision and personal direction of one Samuel Gompers, who is chief agent of the said combination of persons for said purpose, and of each of the said combinations, and the said agents make monthly reports of their doings in pushing and enforcing and causing to be pushed and enforced said boycotts, and publish the same monthly in said paper known as The American Federationist, of which he is the editor, appointed by the said members, which said paper in connection with said statement or summary, is declared to be the authorized and official mouthpiece of each of said subcombinations, including the said United Hatters of

2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty.

North America. Said statement is declared by the defendants to be a faithful record of the doings of said agents, and each of said statements, made during the period covered by the acts of the defendants against the plaintiffs herein stated, contains the announcement to the members of said combination and the public, that all boycotts declared by them are being by them and their agents pushed, enforced and observed.

"15. Said combination of persons collectively known as The American Federation of Labor, of which the defendants are members, was by the defendants and their other members formed for the purpose among others, of facilitating the declaration and successful maintenance of boycotts, by and for said combination of persons known as The United Hatters of North America, acting through the said Federation of Labor and its other component parts or members, and it and its component parts have frequently declared boycotts, at the request of the defendants, against the business and product of various hat manufacturers, and have vigorously prosecuted the same by and through the powerful machinery at their command as aforesaid, in carrying out their general scheme herein stated, to the great damage and loss of business of said manufacturers, and particularly during the years of 1901 and 1902, they declared, prosecuted and waged, at the request of the defendants and their agents, a boycott against the hats made by and the business of H. H. Roelofs & Co., of Philadelphia, Pa., until, by causing them great damage and loss of business, they coerced them into yielding to the demand of the defendants and their agents, that the said factory of said Roelofs & Co. be unionized, as termed by the defendants, and into agreeing to employ, and employing exclusively, members of their said combination in the making and finishing departments of said factory, and in large measure surrendering to the defendants and their agents the control of said factory and business, all of which was well known to the plaintiffs, their customers, wholesale dealers and the public, and was, by the defendants and their agents, widely proclaimed through all their agencies above mentioned, in connection with their acts against the plaintiffs, as hereinafter set forth, for the purpose of intimidating and coercing said wholesale dealers and their customers from buying the hats of the plaintiffs, by creating in their minds the fear that the defendants would invoke and put into operation against them, all said powerful means, measures and machinery, if they should handle the hats of the plaintiffs.

"16. The defendants, together with the other persons united with them in said combination, known as The United Hatters of North America, have been for many years, and now are, engaged in a combined scheme and effort to force all manufacturers of fur hats in the United States, including the plaintiffs, against their will and their previous policy of carrying on their

of a misdemeanor, and, on conviction thereof, shall be punished
by fine not exceeding five thousand dollars, or by imprison-
ment not exceeding one year, or by both said punishments,
in the discretion of the court."

business, to organize their workmen in the departments of making and
finishing, in each of their factories, into an organization, to be part and parcel
of the said combination known as The United Hatters of North America, or
as the defendants and their confederates term it, to unionize their shops,
with the intent thereby to control the employment of labor in and the opera-
tion of said factories, and to subject the same to the direction and control
of persons, other than the owners of the same, in a manner extremely onerous
and distasteful to such owners, and to carry out such scheme, effort and
purpose, by restraining and destroying the interstate trade and commerce
of such manufacturers, by means of intimidation of and threats made to
such manufacturers and their customers in the several States, of boycotting
them, their product and their customers, using therefor all the powerful
means at their command as aforesaid, until such time as from the damage
and loss of business resulting therefrom, the said manufacturers should yield
to the said demand to unionize their factories.

"17. The defendants and other members of said United Hatters of North
America, acting with them and in pursuance of said general combined scheme
and purpose, and in carrying the same into effect against said manufacturers,
including the plaintiffs, and by use of the means above stated, and the fear
thereof, have within a very few years, forced the following named manu-
facturers of hats in the United States to yield to their demand, and unionize
their factories, viz.: [Here follow 70 names of corporations and individuals.]
and until there remained, according to the statements of the defendants,
only twelve hat factories in the United States which had not submitted to
their said demands, and the defendants, in pursuing their warfare against
the plaintiffs, as hereinafter set forth, and in connection with their said acts
against them, have made public announcement of that fact and of the firms
so coerced by them, in order thereby to increase the effectiveness of their
acts in intimidating said wholesale dealers and their customers in States
other than Connecticut, from buying hats from plaintiffs, as hereinafter
set forth.

"18. To carry out said scheme and purpose, the defendants have ap-
pointed and employed and do steadily employ, certain special agents to
act in their behalf, with full and express authority from them and the other
members of said combination, and under explicit instructions from them, to
use every means in their power, to compel all such manufacturers of hats to
so unionize their factories, and each and all of the defendants in this suit did
the several acts hereinafter stated, either by themselves or their agents, by
them thereto fully authorized.

"19. On or about March 1, 1901, in pursuance of said general scheme and
purpose, the defendants and the other members of said combination, The

7. "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the district in

United Hatters of North America, through their agents, the said John A. Moffit, Martin Lawlor, John Phillips, James P. Maher and Charles J. Barrett, who acted for themselves and the other defendants, demanded of the plaintiffs that they should unionize their said factory, in the making and finishing departments, and also thereby acquire the right to use and use the said union label, subject to the right of the defendants to recall the same at pleasure, in all hats made by them, and then notified the plaintiffs that if they failed to yield to said demand, the defendants and all the other members of the said combination known as The United Hatters of North America, would resort to their said usual and well-known methods to compel them so to do. After several conferences, and in April, 1901, the plaintiffs replied to the said demand of the defendants as follows:

"'Firmly believing that we are acting for the best interests of our firm, for the best interests of those whom we employ, and for the best interests of Danbury, by operating an independent or open factory, we hereby notify you that we decline to have our shop unionized, and if attacked, shall use all lawful means to protect our business interests.'

"The plaintiffs were then employing many union and non-union men, and their said factory was running smoothly and satisfactorily both to the plaintiffs and their employés. The defendants, their confederates and agents, deferred the execution of their said threat against the plaintiffs until the conclusion of their attack made in pursuance of the same general scheme and purpose against H. H. Roelofs & Co., which resulted in the surrender of Roelofs & Co., on July 15, 1902, except that the defendants, their confederates and agents, in November, 1901, caused the said American Federation of Labor to declare a boycott against any dealer or dealers who should handle the products of the plaintiffs.

"20. On or about July 25, 1902, the defendants individually and collectively, and as members of said combinations and associations, and with other persons whose names are unknown to the plaintiffs, associated with them, in pursuance of the general scheme and purpose aforesaid, to force all manufacturers of fur hats, and particularly the plaintiffs, to so unionize their factories, wantonly, wrongfully, maliciously, unlawfully and in violation of the provisions of the 'Act of Congress, approved July 2, 1890,' and entitled 'An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies,' and with intent to injure the property and business of the plaintiffs by means of acts done which are forbidden and declared to be unlawful, by said act of Congress, entered into a combination and conspiracy to restrain the plaintiffs and their customers in States other than Connecticut, in carrying on said trade and commerce among the several States and to wholly prevent them from engaging in and carrying on said trade and com-

which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

merce between them and to prevent the plaintiffs from selling their hats to wholesale dealers and purchasers in said States other than Connecticut, and to prevent said dealers and customers in said other States from buying the same, and to prevent the plaintiffs from obtaining orders for their hats from such customers, and filling the same, and shipping said hats to said customers in said States as aforesaid, and thereby injure the plaintiffs in their property and business and to render unsalable the product and output of their said factory, so the subject of interstate commerce, in whosoever's hands the same might be or come, through said interstate trade and commerce, and to employ as means to carry out said combination and conspiracy and the purposes thereof, and accomplish the same, the following measures and acts, viz:

"To cause, by means of threats and coercion, and without warning or information to the plaintiffs, the concerted and simultaneous withdrawal of all the makers and finishers of hats then working for them, who were not members of their said combination, The United Hatters of North America, as well as those who were such members, and thereby cripple the operation of the plaintiffs' factory, and prevent the plaintiffs from filling a large number of orders then on hand, from such wholesale dealers in States other than Connecticut, which they had engaged to fill and were then in the act of filling, as was well known to the defendants; in connection therewith to declare a boycott against all hats made for sale and sold and delivered, or to be sold or delivered, by the plaintiffs to said wholesale dealers in States other than Connecticut, and to actively boycott the same and the business of those who should deal in them, and thereby prevent the sale of the same by those in whose hands they might be or come through said interstate trade in said several States; to procure and cause others of said combinations united with them in said American Federation of Labor, in like manner to declare a boycott against and to actively boycott the same and the business of such wholesale dealers as should buy or sell them, and of those who should purchase them from such wholesale dealers; to intimidate such wholesale dealers from purchasing or dealing in the hats of the plaintiff by informing them that the American Federation of Labor had declared a boycott against the product of the plaintiffs and against any dealer who should handle it, and that the same was to be actively pressed against them, and by distributing circulars containing notices that such dealers and their customers were to be boycotted; to threaten with a boycott those customers who should buy any goods whatever, even though union made, of such boycotted dealers, and at the same time to notify such wholesale dealers that they were at liberty to deal in the hats of any other non-union manufacturer of similar quality to those made by the plaintiffs, but must not deal in the hats made by the

In our opinion, the combination described in the declaration is a combination "in restraint of trade or commerce among the several States," in the sense in which those words are used in the act, and the action can be maintained accordingly.

plaintiffs under threats of such boycotting; to falsely represent to said wholesale dealers and their customers, that the plaintiffs had discriminated against the union men in their employ, had thrown them out of employment because they refused to give up their union cards and teach boys, who were intended to take their places after seven months' instruction, and had driven their employés to extreme measures 'by their persistent, unfair and un-American policy of antagonizing union labor, forcing wages to a starvation scale, and given boys and cheap, unskilled foreign labor preference over experienced and capable union workmen,' in order to intimidate said dealers from purchasing said hats by reason of the prejudice thereby created against the plaintiffs and the hats made by them among those who might otherwise purchase them; to use the said union label of said The United Hatters of North America as an instrument to aid them in carrying out said conspiracy and combination against the plaintiffs' and their customers' interstate trade aforesaid, and in connection with the boycotting above mentioned, for the purpose of describing and identifying the hats of the plaintiffs, and singling them out to be so boycotted; to employ a large number of agents to visit said wholesale dealers and their customers, at their several places of business, and threaten them with loss of business if they should buy or handle the hats of the plaintiffs, and thereby prevent them from buying said hats, and in connection therewith to cause said dealers to be waited upon by committees representing large combinations of persons in their several localities to make similar threats to them; to use the daily press in the localities where such wholesale dealers reside, and do business, to announce and advertise the said boycotts against the hats of the plaintiffs and said wholesale dealers, and thereby make the same more effective and impressive, and to use the columns of their said paper, The Journal of the United Hatters of North America, for that purpose, and to describe the acts of their said agents in prosecuting the same.

"21. Afterwards, to wit, on July 25, 1902, and on divers days since hitherto, the defendants, in pursuance of said combination and conspiracy, and to carry the same into effect, did cause the concerted and simultaneous withdrawal, by means of threats and coercion made by them, and without previous warning or information thereof to the plaintiffs, of all but ten of the non-union makers and finishers of hats then working for them, as well as all of their union makers and finishers, leaving large numbers of hats in an unfinished and perishable condition, with intent to cripple and did thereby cripple the operation of the plaintiffs' factory until the latter part of October, 1902, and thereby prevented the plaintiffs from filling a large number of orders then on hand from such wholesale dealers in States other than Connecticut, which they had engaged to fill and were then in the act of filling, as

And that conclusion rests on many judgments·of this court, to the effect that the act prohibits any combination whatever to secure action which essentially obstructs the free flow of commerce between the States, or restricts, in that regard, the liberty of a trader to engage in business.

well known to the defendants, and thereby caused the loss to the plaintiffs of many orders from said wholesale dealers in other States, and greatly hindered and delayed them in filling such orders, and falsely representing to said wholesale dealers, their customers, and the public generally in States other than Connecticut, that the plaintiffs had discriminated against the union men in their employ, and had discharged or thrown out of employment their union men in August, 1902; that they had driven their employés to extreme measures by their persistent, unfair and un-American policy of antagonizing union labor, forcing wages down to a starvation scale and giving boys and cheap, unskilled foreign labor preference over experienced and capable workmen; that skilled hatters had been discharged from said factory for no other cause than their devotion and adherence to the principles of organized labor in refusing to give up their union cards, and to teach the trade to boys who were intended to take the place of union workmen after seven months' instruction, and that unable to submit longer to a system of petty tyrannies that might be tolerated in Siberia but could not be borne by independent Americans, the workmen in the factory inaugurated the strike to compel the firm to recognize their rights, in order to prejudice, and did thereby prejudice the public, against the plaintiffs and their product, and in order to intimidate, and did thereby intimidate said wholesale dealers and their customers, in States other than Connecticut, from purchasing hats from the plaintiffs by reason of the fear of the prejudice created against said hats; and in connection therewith declared a boycott against all hats made for and so sold and delivered, and to be so sold and delivered to said wholesale dealers, in States other than Connecticut, and actively boycotted the same and the business of those who dealt in them in such other States, and thereby restrained and prevented the purchase of the same from the plaintiffs, and the sale of the same by those in whose hands they were, or might thereafter be, in the course of such interstate trade, and caused and procured others of said combinations united with them in the said American Federation of Labor to declare a boycott against the plaintiffs, their product and against the business of such wholesale dealers in States other than Connecticut, as should buy or sell them, and of those who should purchase from such wholesale dealers any goods whatever, and further intimidated said wholesale dealers from purchasing or dealing in hats made by the plaintiffs, as aforesaid, by informing them that the American Federation of Labor had declared a boycott against the hats of the plaintiffs and against any dealer who should handle them, and that said boycott was to be actively pressed against them, and by sending agents and committees from various of said labor organizations, to threaten said wholesale dealers and their customers with a boycott from them if they

The combination charged falls within the class of restraints
of trade aimed at compelling third parties and strangers in-
voluntarily not to engage in the course of trade except on con-
ditions that the combination imposes; and there is no doubt

purchased or handled the goods of plaintiffs, and by distributing in San
Francisco, California, and other places, circulars containing notices that such
dealers, and their customers were to be boycotted, and threatened with a
boycott, and did actively boycott the customers who did or should buy any
goods whatever, even though union made, of such wholesale dealers so boy-
cotted, and used the daily press to advertise and announce said boycott and
the measures taken in pursuance thereof by said labor organizations, particu-
larly The San Francisco Bulletin, in its issues of July 2 and July 4, 1903, and
a daily paper published in Richmond, Virginia, on December 10, 1902, and
notified such wholesale dealers in States other than Connecticut, that they
were at liberty to deal in the hats of any other non-union hat manufacturer
of similar quality to those of the plaintiffs, but they must not deal in hats
made by the plaintiffs, under threats of being boycotted for so doing, and
used the said union label of the United Hatters of North America as an in-
strument to aid them in carrying out said combination and conspiracy
against the plaintiffs' and their customers' interstate trade, as aforesaid, and
in connection with such boycotting by using the same and its absence from
the hats of the plaintiffs, as an insignia or device to indicate to the purchaser
that the hats of the plaintiffs were to be boycotted, and to point them out
for that purpose, and employed a large number of agents to visit said whole-
sale dealers and their customers at their several places of business in each
of said States, particularly Philadelphia and other places in the State of
Pennsylvania, in Baltimore in the State of Maryland, in Richmond and
other places in the State of Virginia, and in San Francisco and other places
in the State of California, to intimidate and threaten them, if they should
continue to deal in or handle the hats of the plaintiffs, and among many
other instances of like kind, the said William C. Hennelly and Daniel P.
Kelly in behalf of all said defendants, and acting for them, demanded the
firm of Triest & Co., wholesale dealers in hats, doing business in said San
Francisco, that they should agree not to buy or deal in the hats made by
the plaintiffs, under threats made by them to said firm of boycotting their
business and that of their customers, and upon their refusing to comply with
such demand and yield to such threats, the defendants by their said agents
caused announcement to be made in the newspapers of said city that said
Triest & Co. were to be boycotted therefor, and that the labor council of
San Francisco would be addressed by them for that purpose, and that they
had procured a boycott to be declared by said labor council, and thereupon
the defendants, through their said agents, Hennelly and Kelly, printed,
published, issued and distributed to the retail dealers in hats, in several
States upon the Pacific coast, the following circular, to wit:

that (to quote from the well-known work of Chief Justice Erle on Trade Unions) "at common law every person has individually, and the public also has collectively, a right to require that the course of trade should be kept free from unreasonable

---

" 'San Francisco Labor Council,
" 'Affiliated with the American Federation of Labor,
" '.'Secretary's Office, 927 Market Street,
" 'Rooms 405, 406, 407 Emma Spreckel's Building,
" 'Meets every Friday, at 1159 Mission St.
" 'Telephone South 447.
" 'Address all communications to 927 Market Street.
. " 'San Francisco, July 3, 1903.
" 'To whom it may concern:

" 'At a special meeting of the San Francisco Labor Council held on the above date, the hat jobbing concern known as Triest & Co., 116 Sansome St., San Francisco, was declared unfair for persistently patronizing the unfair hat manufacturing concern of D. E. Loewe & Co., Danbury, Connecticut, where the union hatters have been on strike, for union conditions, since August 20, 1902. Triest & Co. will be retained on the unfair list as long as they handle the product of this unfair hat manufacturing concern. Union men do not usually patronize retail stores who buy from unfair jobbing houses or manufacturers. Under these circumstances, all friends of organized labor, and those desiring the patronage of organized workers, will not buy goods from Triest & Co., 116 Sansome St., San Francisco.

" 'Yours respectfully, G. B. BENHAM,
" '*President S. F. Labor Council.*
" 'T. E. ZANT,
" '*Secretary S. F. Labor Council.* [L. S.]
" 'W. C. HENNELLY,
" 'D. F. KELLY,
" '*Representing United Hatters of North America.*'

" Also the following, to wit:
" 'San Francisco Labor Council,
" 'Affiliated with American Federation of Labor,
" 'Secretary's Office, 927 Market Street,
" 'Rooms 405, 406, 407 Emma Spreckel's Building,
" 'Meets every Friday, at 1159 Mission St.
" 'Telephone South 447.
. " 'Address all communications to 927 Market Street.
. " 'San Francisco, July 14, 1903.
" 'Messrs. ——— ———.
" 'Gentlemen: We beg leave to call your attention to the following products which are on the unfair list of the American Federation of Labor.
" 'We do this in order that you refrain from handling these goods, as the

obstruction." But the objection here is to the jurisdiction, because, even conceding that the declaration states a case good at common law, it is contended that it does not state one within the statute. Thus, it is said, that the restraint alleged would operate to entirely destroy plaintiffs' business and thereby include intrastate trade as well; that physical obstruc-

---

patronage of the firms named below is taken by the organized workers as an evidence of a desire to patronize those who are opposed to the interests of organized labor. The declaration of unfairness regarding the firms mentioned is fully sanctioned and will be supported to the fullest degree by the San Francisco Labor Council.

" 'Trusting that you will be able to avoid the handling of these goods in the future, we are,

" 'Yours respectfully,        G. B. BENHAM, *President.*
". 'T. E. ZANT, *Secretary.* [L. S.]

" 'Unfair List.

" 'Loewe & Co., Danbury, Conn., and Triest & Co., 116 Sansome St., San Francisco, Hat Manufacturers;

" 'Cluett, Peabody & Co., Shirts and Collars, Troy, New York, and 562 Mission St.,-San Francisco, Cal.;

" 'United Shirt and Collar Co., Troy, New York, and 25 Sansome St., San Francisco, Cal.;

" 'Van Zandt, Jacobs & Co., Troy, 'New York; 'Greenbaum, Weil & Michaels, Selling Agents, 27 Sansome St., San Francisco, Cal.'

and caused said circulars to be mailed to and personally delivered to the retail dealers in hats, and the other customers of said Triest & Co., upon the Pacific coast, and to many others, thereby causing the loss of many orders and customers to said Triest & Co., and to the plaintiffs, for the purpose of intimidating and coercing said Triest & Co. not to deal with the plaintiffs, and thereby cause the loss of many orders and customers to said Triest & Co., and to the plaintiffs.

"22. By means of each and all of said acts done by the defendants in pursuance of said combination and conspiracy, they have greatly restrained, diminished, and, in many places, destroyed the trade and commerce of the plaintiffs with said wholesale dealers, in said States other than Connecticut, by the loss of many orders and customers directly resulting therefrom, and the plaintiffs have been injured in their business and property by reason of said combination and conspiracy, and the acts of the defendants done in pursuance thereof, and to carry the same into effect, which are declared to be unlawful by said act of Congress, to the amount of eighty thousand ($80,000) dollars, to recover threefold which damages, under section 7 of said act this suit is brought."

tion is not alleged as contemplated; and that defendants are not themselves engaged in interstate trade.

We think none of these objections are tenable, and that they are disposed of by previous decisions of this court.

*United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290; *United States* v. *Joint Traffic Association,* 171 U. S. 505; and *Northern Securities Company* v. *United States,* 193 U. S. 197, hold in effect that the Anti-Trust law has a broader application than the prohibition of restraints of trade unlawful at common law. Thus in the *Trans-Missouri Case,* 166 U. S. 290, it was said that, "assuming that agreements of this nature are not void at common law, and that the various cases cited by the learned courts below show it, the answer to the statement of their validity is to be found in the terms of the statute under consideration;" and in the *Northern Securities Case,* 193 U. S. 331, that, "the act declares illegal every contract, combination or conspiracy, in whatever form, of whatever nature, and whoever may be the parties to it, which directly or necessarily operates in restraint of trade or commerce among the several States."

We do not pause to comment on cases such as *United States* v. *Knight,* 156 U. S. 1; *Hopkins* v. *United States,* 171 U. S. 578; and *Arderson* v. *United States,* 171 U. S. 604; in which the undisputed facts showed that the purpose of the agreement was not to obstruct or restrain interstate commerce. The object and intention of the combination determined its legality.

In *Swift* v. *United States,* 196 U. S. 375, a bill was brought against a number of corporations, firms and individuals of different States, alleging that they were engaged in interstate commerce in the purchase, sale, transportation and delivery, and subsequent resale at the point of delivery, of meats; and that they combined to refrain from bidding against each other in the purchase of cattle; to maintain a uniform price at which the meat should be sold; and to maintain uniform charges in delivering meats thus sold through the channels of interstate trade to the various dealers and consumers in other States.

And that thus they artificially restrained commerce in fresh meats from the purchase and shipment of live stock from the plains to the final distribution of the meats to the consumers in the markets of the country.

Mr. Justice Holmes, speaking for the court, said (pp. 395, 396, 398):

"Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce.

\*    *    *    *    *    *    *    *

"The general objection is urged that the bill does not set forth sufficient, definite or specific facts. This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous and shifting, even the constituent parts alleged are and from their nature must be so extensive in time and space, that something of the same impossibility applies to them.

\*    *    *    *    *    *    *    *

"The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately, when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is

suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as parts of a single plan. The plan may make the parts unlawful."

And the same principle was expressed in *Aikens* v. *Wisconsin*, 195 U. S. 194, 205, involving a statute of Wisconsin prohibiting combinations "for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever," etc., in which Mr. Justice Holmes said:

"The statute is directed against a series of acts, and acts of several, the acts of combining, with intent to do other acts, 'The very plot is an act in itself.' *Mulcahy* v. *The Queen*, L. R. 3 H. L. 306, 317. But an act, which in itself is merely a voluntary muscular contraction, derives all its character from the consequences which will follow it under the circumstances in which it was done. When the acts consist of making a combination calculated to cause temporal damage, the power to punish such acts, when done maliciously, cannot be denied because they are to be followed and worked out by conduct which might have been lawful if not preceded by the acts. No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and if it is a step in a plot neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law."

In *Addyston Pipe and Steel Company* v. *United States*, 175 U. S. 211, the petition alleged that the defendants were practically the only manufacturers of cast iron within thirty-six States and Territories, that they had entered into a combination by which they agreed not to compete with each other in the sale of pipe, and the territory through which the constituent companies could make sales was allotted between them. This court held that the agreement which, prior to any act of transportation, limited the prices at which the pipe could be

sold after transportation, was within the law. Mr. Justice Peckham, delivering the opinion, said (p. 242): "And when Congress has enacted a statute such as the one in question, any agreement or combination which directly operates not alone upon the manufacture but upon the sale, transportation and delivery of an article of interstate commerce, by preventing or restricting its sale, etc., thereby regulates interstate commerce."

In *Montague & Company* v. *Lowry,* 193 U. S. 38, which was an action brought by a private citizen under § 7 against a combination engaged in the manufacture of tiles, defendants were wholesale dealers in tiles in California and combined with manufacturers in other States to restrain the interstate traffic in tiles by refusing to sell any tiles to any wholesale dealer in California who was not a member of the association except at a prohibitive rate. The case was a commercial boycott against such dealers in California as would not or could not obtain membership in the association. The restraint did not consist in a physical obstruction of interstate commerce, but in the fact that the plaintiff and other independent dealers could not purchase their tiles from manufacturers in other States because such manufacturers had combined to boycott them. This court held that this obstruction to the purchase of tiles, a fact antecedent to physical transportation, was within the prohibition of the act. Mr. Justice Peckham, speaking for the court, said (p. 45), concerning the agreement, that it "restrained trade, for it narrowed the market for the sale of tiles in California from the manufacturers and dealers therein in other States, so that they could only be sold to the members of the association, and it enhanced prices to the non-member."

The averments here are that there was an existing interstate traffic between plaintiffs and citizens of other States, and that for the direct purpose of destroying such interstate traffic defendants combined not merely to prevent plaintiffs from manufacturing articles then and there intended for transportation beyond the State, but also to prevent the vendees from reselling the hats which they had imported from Connecticut, or from

further negotiating with plaintiffs for the purchase and inter-transportation of such hats from Connecticut to the various places of destination. So that, although some of the means whereby the interstate traffic was to be destroyed were acts within a State, and some of them were in themselves as a part of their obvious purpose and effect beyond the scope of Federal authority, still, as we have seen, the acts must be considered as a whole, and the plan is open to condemnation, notwithstanding a negligible amount of intrastate business might be affected in carrying it out. If the purposes of the combination were, as alleged, to prevent any interstate transportation at all, the fact that the means operated at one end before physical transportation commenced and at the other end after the physical transportation ended was immaterial.

Nor can the act in question be held inapplicable because defendants were not themselves engaged in interstate commerce. The act made no distinction between classes. It provided that "every" contract, combination or conspiracy in restraint of trade was illegal. The records of Congress show that several efforts were made to exempt, by legislation, organizations of farmers and laborers from the operation of the act and that all these efforts failed, so that the act remained as we have it before us.

In an early case, *United States* v. *Workingmen's Amalgamated Council,* 54 Fed. Rep. 994, the United States filed a bill under the Sherman act in the Circuit Court for the Eastern District of Louisiana, averring the existence of "a gigantic and widespread combination of the members of a multitude of separate organizations for the purpose of restraining the commerce among the several States and with foreign countries," and it was contended that the statute did not refer to combinations of laborers. But the court, granting the injunction, said:

"I think the Congressional debates show that the statute had its origin in the evils of massed capital; but, when the Congress came to formulating the prohibition, which is the yardstick for measuring the complainant's right to the injunction,

it expressed it in these words: 'Every contract or combination in the form of trust, or otherwise in restraint of trade or commerce among the several States or with foreign nations, is hereby declared to be illegal.' The subject had so broadened in the minds of the legislators that the source of the evil was not regarded as material, and the evil in its entirety is dealt with. They made the interdiction include combinations of labor, as well as of capital; in fact, all combinations in restraint of commerce, without reference to the character of the persons who entered into them. It is true this statute has not been much expounded by judges, but, as it seems to me, its meaning, as far as relates to the sort of combinations to which it is to apply, is manifest, and that it includes combinations which are composed of laborers acting in the interest of laborers.

\* \* \* \* \* \* \* \*

"It is the successful effort of the combination of the defendants to intimidate and overawe others who were at work in conducting or carrying on the commerce of the country, in which the court finds their error and their violation of the statute. One of the intended results of their combined action was the forced stagnation of all the commerce which flowed through New Orleans. This intent and combined action are none the less unlawful because they included in their scope the paralysis of all other business within the city as well."

The case was affirmed on appeal by the Circuit Court of Appeals for the Fifth Circuit. 57 Fed. Rep. 85.

Subsequently came the litigation over the Pullman strike and the decisions, In re Debs, 64 Fed. Rep. 724, 745, 755; S. C., 158 U. S. 564. The bill in that case was filed by the United States against the officers of the American Railway Union, which alleged that a labor dispute existed between the Pullman Palace Car Company and its employés; that thereafter the four officers of the railway union combined together and with others to compel an adjustment of such dispute by creating a boycott against the cars of the car company; that to make such boycott effective they had already prevented cer-

tain of the railroads running out of Chicago from operating their trains; that they asserted that they could and would tie up, paralyze and break down any and every railroad which did not accede to their demands, and that the purpose and intention of the combination was "to secure unto themselves the entire control of the interstate, industrial and commercial business in which the population of the city of Chicago and of other communities along the lines of road of said railways are engaged with each other, and to restrain any and all other persons from any independent control or management of such interstate, industrial or commercial enterprises, save according to the will and with the consent of the defendants."

The Circuit Court proceeded principally upon the Sherman Anti-Trust law, and granted an injunction. In this court the case was rested upon the broader ground that the Federal Government had full power over interstate commerce and over the transmission of the mails, and in the exercise of those powers could remove everything put upon highways, natural or artificial, to obstruct the passage of interstate commerce, or the carrying of the mails. But in reference to the Anti-Trust Act the court expressly stated (158 U. S. 600):

"We enter into no examination of the act of July 2, 1890, c. 647, 26 Stat. 209, upon which the Circuit Court relied mainly to sustain its jurisdiction. It must not be understood from this that we dissent from the conclusions of that court in reference to the scope of the act, but simply that we prefer to rest our judgment on the broader ground which has been discussed in this opinion, believing it of importance that the principles underlying it should be fully stated and affirmed."

And in the opinion, Mr. Justice Brewer, among other things, said (p. 581):

"It is curious to note the fact that in a large proportion of the cases in respect to interstate commerce brought to this court the question presented was of the validity of state legislation in its bearings upon interstate commerce, and the uniform course of decision has been to declare that it is not within

the competency of a State to legislate in such a manner as to obstruct interstate commerce. If a State, with its recognized powers of sovereignty, is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that State has a power which the State itself does not possess?"

The question answers itself, and in the light of the authorities the only inquiry is as to the sufficiency of the averments of fact. We have given the declaration in full in the margin, and it appears therefrom that it is charged that defendants formed a combination to directly restrain plaintiffs' trade; that the trade to be restrained was interstate; that certain means to attain such restraint were contrived to be used and employed to that end; that those means were so used and employed by defendants, and that thereby they injured plaintiffs' property and business.

At the risk of tediousness, we repeat that the complaint averred that plaintiffs were manufacturers of hats in Danbury, Connecticut, having a factory there, and were then and there engaged in an interstate trade in some twenty States other than the State of Connecticut; that they were practically dependent upon such interstate trade to consume the product of their factory, only a small percentage of their entire output being consumed in the State of Connecticut; that at the time the alleged combination was formed they were in the process of manufacturing a large number of hats for the purpose of fulfilling engagements then actually made with consignees and wholesale dealers in States other than Connecticut, and that if prevented from carrying on the work of manufacturing these hats they would be unable to complete their engagements.

That defendants were members of a vast combination called The United Hatters of North America, comprising about 9,000 members and including a large number of subordinate unions, and that they were combined with some 1,400,000 others into another association known as The American Federation of

Labor, of which they were members, whose members resided in all the places in the several States where the wholesale dealers in hats and their customers resided and did business; that defendants were "engaged in a combined scheme and effort to force all manufacturers of fur hats in the United States, including the plaintiffs, against their will and their previous policy of carrying on their business, to organize their workmen in the departments of making and finishing, in each of their factories, into an organization, to be part and parcel of the said combination known as The United Hatters of North America, or as the defendants and their confederates term it, to unionize their shops, with the intent thereby to control the employment of labor in and the operation of said factories, and to subject the same to the direction and control of persons, other than the owners of the same, in a manner extremely onerous and distasteful to such owners, and to carry out such scheme, effort and purpose, by restraining and destroying the interstate trade and commerce of such manufacturers, by means of intimidation of and threats made to such manufacturers and their customers in the several States, of boycotting them, their product and their customers, using therefor all the powerful means at their command, as aforesaid, until such time as, from the damage and loss of business resulting therefrom, the said manufacturers should yield to the said demand to unionize their factories."

That the conspiracy or combination was so far progressed that out of eighty-two manufacturers of this country engaged in the production of fur hats seventy had accepted the terms and acceded to the demand that the shop should be conducted in accordance, so far as conditions of employment were concerned, with the will of the American Federation of Labor; that the local union demanded of plaintiffs that they should unionize their shop under peril of being boycotted by this combination, which demand defendants declined to comply with; that thereupon the American Federation of Labor, acting through its official organ and through its organizers, declared a boycott.

The complaint then thus continued:

"20. On or about July 25, 1902, the defendants individually and collectively, and as members of said combinations and associations, and with other persons whose names are unknown to the plaintiffs, associated with them, in pursuance of the general scheme and purpose aforesaid, to force all manufacturers of fur hats, and particularly the plaintiffs, to so unionize their factories, wantonly, wrongfully, maliciously, unlawfully and in violation of the provisions of the 'Act of Congress, approved July 2, 1890,' and entitled 'An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies,' and with intent to injure the property and business of the plaintiffs by means of acts done which are forbidden and declared to be unlawful, by said act of Congress, entered into a combination and conspiracy to restrain the plaintiffs and their customers in States other than Connecticut, in carrying on said trade and commerce among the several States, and to wholly prevent them from engaging in and carrying on said trade and commerce between them and to prevent the plaintiffs from selling their hats to wholesale dealers and purchasers in said States other than Connecticut, and to prevent said dealers and customers in said other States from buying the same, and to prevent the plaintiffs from obtaining orders for their hats from such customers, and filling the same, and shipping said hats to said customers in said States as aforesaid, and thereby injure the plaintiffs in their property and business and to render unsalable the product and output of their said factory, so the subject of interstate commerce, in whosoever's hands the same might be or come, through said interstate trade and commerce, and to employ as means to carry out said combination and conspiracy and the purposes thereof, and accomplish the same, the following measures and acts, viz:

"To cause, by means of threats and coercion, and without warning or information to the plaintiffs, the concerted and simultaneous withdrawal of all the makers and finishers of hats then working for them, who were not members of their said

combination, The United Hatters of North America, as well as those who were such members, and thereby cripple the operation of the plaintiffs' factory, and prevent the plaintiffs from filling a large number of orders then on hand, from such wholesale dealers in States other than Connecticut, which they had engaged to fill and were then in the act of filling, as was well known to the defendants; in connection therewith to declare a boycott against all hats made for sale and sold and delivered, or to be so sold or delivered, by the plaintiffs to said wholesale dealers in States other than Connecticut, and to actively boycott the same and the business of those who should deal in them, and thereby prevent the sale of the same by those in whose hands they might be or come through said interstate trade in said several States; to procure and cause others of said combinations united with them in said American Federation of Labor, in like manner to declare a boycott against and to actively boycott the same and the business of such wholesale dealers as should buy or sell them, and of those who should purchase them from such wholesale dealers; to intimidate such wholesale dealers from purchasing or dealing in the hats of the plaintiffs by informing them that the American Federation of Labor had declared a boycott against the product of the plaintiffs and against any dealer who should handle it, and that the same was to be actively pressed against them, and by distributing circulars containing notices that such dealers and their customers were to be boycotted; to threaten with a boycott those customers who should buy any goods whatever, even though union made, of such boycotted dealers, and at the same time to notify such wholesale dealers that they were at liberty to deal in the hats of any other non-union manufacturer of similar quality to those made by the plaintiffs, but must not deal in the hats made by the plaintiffs under threats of such boycotting; to falsely represent to said wholesale dealers and their customers, that the plaintiffs had discriminated against the union men in their employ, had thrown them out of employment because they refused to give up their union cards and

teach boys, who were intended to take their places after seven months' instruction, and had driven their employés to extreme measures 'by their persistent, unfair and un-American policy of antagonizing union labor, forcing wages to a starvation scale, and given boys and cheap, unskilled foreign labor preference over experienced and capable union workmen,' in order to intimidate said dealers from purchasing said hats by reason of the prejudice thereby created against the plaintiffs and the hats made by them among those who might otherwise purchase them; to use the said union label of said The United Hatters of North America as an instrument to aid them in carrying out said conspiracy and combination against the plaintiffs' and their customers' interstate trade aforesaid, and in connection with the boycotting above mentioned, for the purpose of describing and identifying the hats of the plaintiffs and singling them out to be so boycotted; to employ a large number of agents to visit said wholesale dealers and their customers, at their several places of business, and threaten them with loss of business if they should buy or handle the hats of the plaintiffs, and thereby prevent them from buying said hats, and in connection therewith to cause said dealers to be waited upon by committees representing large combinations of persons in their several localities to make similar threats to them; to use the daily press in the localities where such wholesale dealers reside, and do business, to announce and advertise the said boycotts against the hats of the plaintiffs and said wholesale dealers, and thereby make the same more effective and oppressive, and to use the columns of their said paper, The Journal of the United Hatters of North America, for that purpose, and to describe the acts of their said agents in prosecuting the same."

And then followed the averments that the defendants proceeded to carry out their combination to restrain and destroy interstate trade and commerce between plaintiffs and their customers in other States by employing the identical means contrived for that purpose; and that by reason of those acts

plaintiffs were damaged in their business and property in some $80,000.

We think a case within the statute was set up and that the demurrer should have been overruled.

*Judgment reversed and cause remanded with a direction to proceed accordingly.*