UNITED STATES v. SOUTHERN WHOLESALE GROCERS' ASS'N et al.

(District Court, N. D. Alabama, S. D. August 4, 1913.)

No. 3,861.

1. MONOPOLIES (§ 24*)—ACTIONS—DECREE—VIOLATIONS.

Where, in a suit against an association of wholesale grocers whose constitution and by-laws stated its purpose to be the promoting of harmony between the members of the association and the manufacturers of food products, to the end that the wholesale grocers might be recognized as the economical channel of distribution of the products of the manufacturers, to restrain alleged violations of the Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), the decree, after enjoining certain acts, expressly provided that the association, its officers and members, were not restrained from maintaining the organization for social or other purposes than those therein prohibited, the mere maintenance of the association subsequent to the decree under the same constitution and by-laws was not a violation of the decree, since it would be presumed that the court familiarized itself with the fundamental nature of the association as set out in its constitution and by-laws, and in view of this presumption the decree was intended to mean that the court found no illegality in the framework of the association's organization but only in certain of its activities, which were expressly enjoined.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

―――――――――――――――――――――――――――――――――――――――――――――――
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MONOPOLIES (§ 24*)—ACTIONS—DECREE—VIOLATIONS.

A decree enjoining an association of wholesale grocers from publishing any book, pamphlet, or list containing only the names of wholesale grocers who had announced their intention or agreed, directly or indirectly, expressly or impliedly, to work in harmony with the association was violated by the issuance of lists, the names in which were purposely confined to those, whether members or nonmembers or those otherwise not in sympathy with its purposes, who worked in harmony with the association in effecting its purpose of confining the sales of manufacturers to those who were exclusive wholesalers, and the addition or omission of names with intent to evade the decree did not change the situation.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

3. MONOPOLIES (§ 17*)—COMBINATIONS PROHIBITED—DISCRIMINATIONS IN SALE OF GOODS.

A contract between many engaged in the same business to refrain from selling to an individual or class would be an illegal restraint of trade under the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), prohibiting contracts, conspiracies, or combinations in restraint of trade, unenforceable at law and subjecting the participants to a criminal prosecution, whether the contract were express or implied or consisted of a mere combination or conspiracy to accomplish that end or without any definite form of agreement.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

4. MONOPOLIES (§ 24*)—ACTIONS—DECREE—VIOLATIONS.

Where the decree in a suit against an association of wholesale grocers to enjoin certain alleged violations of the anti-trust law, after enjoining certain acts, specifically provided that the association, its officers and members, were not restrained from maintaining the organization for social or other purposes than those therein prohibited, the exaction of a promise from prospective members not to sell direct to consumers while they remained members of the association, without requiring any oath to this effect or imposing any forfeit, fine, or penalty except ineligibility to continued membership, was not a violation of the decree, since, the membership being limited to exclusive wholesalers, the purpose of this promise was merely to convince the association that there was a reasonable expectation on the part of the applicant that he would remain eligible long enough to justify his admission to membership.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

5. MONOPOLIES (§ 24*)—ACTIONS—DECREE—VIOLATIONS.

In a suit against an association of wholesale grocers to enjoin alleged violations of the Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), the decree enjoined the association, its directors, officers, etc., from doing any act to hinder or prevent, by intimidation or coercion, any person, firm, or corporation from selling any commodity to any other person at any price agreed upon. The association had previously issued lists of exclusive wholesale grocers, called the "Green Book," as a means of compelling manufacturers to confine their sales to those whose names appeared on the list. Subsequent to the decree there was no express repudiation of the former policy of coercion, and the association continued to send its lists to manufacturers and on request to furnish manufacturers information as to the standing of applicants for the privilege of buying direct from manufacturers. *Held*, that these acts constituted a violation of the decree, since, considered in connection with the former policy of coercion, they constituted a deliberate utilization by the association of the influence over the manufacturers which its previous policy had gained for it, especially where subsequent

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to the decree it mailed to manufacturers a circular stating that it would continue to issue the "Green Book," and that none of its methods, rules of practice, or activities would be affected by the decree, difficulty continued to attend the direct buying from certain manufacturers supplied with lists unless the buyer's name appeared on the lists, and a general impression prevailed that listing was essential to direct buying privileges.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

### 6. MONOPOLIES (§ 12*)—COMBINATIONS—STATUTORY PROVISIONS.

An association of wholesale grocers, by addressing legitimate argument to manufacturers to procure the abandonment by manufacturers of a certain policy and the continuance of another policy, did not violate the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), prohibiting contracts, conspiracies, or combinations in restraint of trade, nor a decree enjoining violations of that act, but expressly permitting the association to continue its organization for social or other purposes than those therein prohibited.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

### 7. MONOPOLIES (§ 24*)—ACTIONS—DECREE—VIOLATIONS.

Where a director of an association of wholesale grocers, which, with its directors, officers, etc., had been enjoined from preventing manufacturers, by coercion or intimidation, from selling direct to retailers, made use of the association's name and his position in it as a director to prevent such direct sales by a manufacturer, the fact that as a director he had no authority to take such action, while it might exonerate the association, did not have that effect as to the director.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

### 8. INJUNCTION (§ 225*)—DECREE—VIOLATIONS.

Violations of an injunction decree were not excusable because those violating it did not intend to violate it or were ignorant of the meaning of its terms.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 474–477, 480–483; Dec. Dig. § 225.*]

### 9. CONTEMPT (§ 9*)—OBSTRUCTION OF ADMINISTRATION OF JUSTICE.

Under Rev. St. § 725 (U. S. Comp. St. 1901, p. 583), authorizing United States courts to punish contempts of their authority, but providing that such power shall not be construed to extend to cases except the misbehavior of any person in their presence or so near thereto as to obstruct the administration of justice, the writing of letters by a party enjoined from doing certain acts, criticising the government and the litigation instituted by it, resulting in the injunction, but not directly calculated to incite disobedience to the injunction decree, was not a contempt.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 15–18; Dec. Dig. § 9.*]

Prosecution for criminal contempt against the Southern Wholesale Grocers' Association and others. The defendant named and three other defendants found guilty, and all other defendants discharged.

O. D. Street, U. S. Atty., of Birmingham, Ala.

Luke E. Wright and Caruthers Ewing, both of Memphis, Tenn., and Percy, Benners & Burr, of Birmingham, Ala., for defendants.

GRUBB, District Judge. This is a proceeding against the defendants for a criminal contempt, alleged to have been committed by them

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

through the violation of a final decree of this court entered in a cause on the equity side of its docket, in which the United States was plaintiff and the association and its officers and some of its members were defendants. The purpose of the bill in the equity cause was to restrain the defendants from the commission of certain acts alleged to be violations of the act of Congress of July 2, 1890, commonly known as the Sherman Anti-Trust Law, and to have the association declared to be an illegal conspiracy in restraint of trade and dissolved for that reason. After the cause was at issue and some of the proof taken, the United States, through the Department of Justice, and the defendants came to an agreement with relation to its subject-matter, which was consummated by the entry in the cause of a final decree by the Circuit Court, with consent of the parties. The decree was entered of record October 17, 1911, and a copy of it is appended to this opinion. The decree did not dissolve the association, and it, in fact, continued its organization and at least some of its previous activities thereafter and up to the time the present proceedings were instituted against it by the United States in February, 1913.

The amended specifications of the acts on which the United States relied to show a violation of the decree are 51 in number. It is not necessary to consider them seriatim. They may all be classified into five distinct kinds and so treated. They relate: (I) To the maintenance of the organization after the date of the decree for the purposes and objects set out in its constitution and by-laws; (II) to the issuance of lists of wholesale grocers, issued after the decree, alleged to have been of the description enjoined thereby; (III) to alleged acts of the association in exacting promises from prospective members not to sell direct to consumers; (IV) to alleged undue persuasion or coercion exercised by the association, its officers and members, upon manufacturers to prevent their selling their products direct to the retailer or for the accomplishment of other objects and purposes; and (V) to acts of the association through its president or other officers and members alleged to have been obstructive of justice, in that their effect was to disparage the decree and induce disobedience thereto. The United States introduced evidence in support of each of these five classes of acts. It was not seriously controverted that they happened, if at all, in connection with interstate commerce, so as to confer jurisdiction on the court.

The issue was not so much whether the specific acts complained of by the United States were in fact done as it was whether the doing of them, under the circumstances, constituted violations of the decree of the court, and it is to this aspect of the case that this opinion will be addressed. The United States disclaims any purpose of asking punishment for any act not a violation of the act of July 2, 1890, though it might be held to be a violation of the terms of the decree. It rested its case entirely upon the first section of the act of July 2, 1890, which prohibits contracts, conspiracies, or combinations in restraint of interstate trade.

[1] I. The United States contends that an association having the declared purposes of the defendant association constitutes by its very existence a conspiracy in restraint of interstate trade and commerce,

in violation of the Sherman Anti-Trust Act. The decree does not enjoin the maintenance of the organization of the association. On the contrary, it contains the express recital:

"The said association and its officers and members are not restrained from maintaining said organization for social or other purposes than those herein prohibited."

In order to constitute an act or omission a contempt, the United States is, in view of its concession, required to establish, with the degree of certainty required in criminal cases: (1) That the act or omission is a restraint of interstate trade under the Sherman Law, and (2) that it is prohibited by the terms of the decree. No reciprocal concession was made by the defendants, having the effect of relieving the plaintiff from establishing the second proposition.

The contention of the government is that, while the decree permits the continued maintenance of the association's organization as a legal entity, it does not legalize its existence for the purposes and objects set out in its constitution and by-laws. The general tenor of the alleged objectionable purposes there set forth was the promoting of harmony between the members of the association, who were exclusive wholesale grocers doing business in 14 southern states, and the manufacturers of food products, to the end that the wholesale grocers might be recognized as the economical channel of distribution of the products of the manufacturers.

It is not necessary to determine whether an association with such a declared object would constitute an illegal restraint of trade, without reference to the character of the activities employed by it to accomplish such purposes, and therefore a violation of the Sherman Law, unless it is to be held also to constitute a violation of the terms of the decree in this cause, since both must concur to result in a conviction in this proceeding. It seems to me that the Circuit Court will be presumed to have familiarized itself with the fundamental nature of the association, as set out in its constitution and by-laws, before the decree recognizing its legality was entered, at least to the extent that would have enabled it to pass on the legality of the association, on the face of its organic laws. In view of this presumption, the declaration of the decree that the "said association, its officers and members, are not restrained from maintaining said organization" for certain purposes seems intended to mean that the court found no illegality in the framework of its organization, so far as appeared from its records, but only in certain of its activities, those which were expressly enjoined by the decree. "Said organization" referred to in the decree is the organization under the same constitution and by-laws which is now asserted to be illegal. Not only is there no expressed injunction in the decree against the maintenance of that organization, but an express disclaimer by the court, which prevents any implication of one. Hence the continued maintenance of the organization under the same constitution and by-laws, after the decree, is not a violation of the decree.

[2] II. This relates to the issuance of lists of wholesale grocers by the association since the date of the decree. The part of the decree

covering this phase of the case is contained in its first paragraph and is as follows:

"And they and each of them be and are likewise enjoined, restrained, and prohibited from publishing, causing to be published, and assisting or encouraging the publication, distribution, or circulation of any book, pamphlet, or list, wherein is contained only the names of wholesale grocers, located in the territory embraced by said organization, who have announced their intention or agreed directly or indirectly, expressly or impliedly, to work in harmony with the association."

It was conceded that the association, after the date of the decree, issued to manufacturers some of its lists that were in existence at the time of the entry of the decree, and also some that were subsequently published by it. The question was whether they were of the kind enjoined.

The association seems to have construed the words of the decree, "to work in harmony with the association," as being synonymous with "members of the association." That this was too narrow a construction is obvious. There was evidence pro and con upon the issue as to whether the list contained the names of persons or firms out of sympathy with the declared purposes of the association. It is clear that, if its names were purposely confined to those (whether members or nonmembers, or those otherwise not in sympathy with its purposes) who worked in harmony with the association in effecting its purpose of confining the sales of manufacturers to those who were exclusive wholesalers, then it answered the description of the lists that were enjoined by the decree; and the issuance, after the entry of the decree, of such lists would be a violation of it. Nor would the adding to or omission of names from the list, with the intent to evade the decree, change the situation in this respect. Whether the evidence is persuasive beyond reasonable doubt that the lists were of the description enjoined, so that the issue of them, disconnected from the circumstances under which they were issued, constituted of itself a contempt, need not be determined, in view of the difficulty, if not the impossibility, of considering it apart from all the surrounding circumstances, and in view of the decision reached by the court that their issue, considered in connection with the attendant circumstances, constituted a violation of the decree.

III. The third class of acts of the association upon which contempt is predicated relates to the promise, alleged to have been exacted of the prospective members of the association by it, as a condition to election and continuance in membership, viz., not to sell direct to consumers while they remained members of the association.

[3] It may be conceded, as contended by the plaintiff, that a contract between many engaged in the same business to refrain from selling to an individual or a class would be an illegal restraint of trade under the Sherman Act, unenforceable at law and subjecting the participants to a criminal prosecution thereunder. Such a contract might be express or implied, or consist of a mere combination or conspiracy to accomplish that end. No definite form of agreement is required. The question, in this case, is whether such a contract, combination, or conspiracy can be deduced from the facts in evidence.

[4] The membership of the association was by its constitution (which met the approval of the Circuit Court) limited to exclusive wholesale grocers. To admit one to membership, it was first essential to determine his qualifications. It was therefore necessary for the association to ascertain, concerning each applicant for membership, whether he was, at the time he sought membership, an exclusive wholesaler. It would otherwise have been impossible to maintain an association composed only of the wholesale grocers, and the decree recognizes the propriety of an organization with such a membership. It would be equally impossible to maintain a like organization if members, after admission, were free to engage in retail business and still remain members. It was therefore proper for the association to purge itself of retailers and semijobbers. A means of doing this was to investigate the business of members and drop those who might have lapsed into retailers. It would be futile to admit one to membership, unless his expectation when admitted was to remain an exclusive wholesaler for a reasonable length of time, since otherwise he would cease to be eligible to continued membership as soon as he reverted to the retail business. There could be no impropriety, for the purpose of determining present and future eligibility, to ask and receive assurances from the applicant that he expected to engage, while a member, in the exclusive wholesale business. There was no other feasible way of determining eligibility to membership in the association. No oath to refrain from selling direct to consumers was administered to the applicant, and no forfeit, fine, or penalty imposed in case the promise was broken by him. No sanction accompanied the applicant's assurance or promise, and the only liability that followed a lapse on the part of the new member was ineligibility to continued membership. If an association exclusively of wholesale grocers was to exist, it was necessary that ineligibility be visited upon any member who ceased to be a wholesale grocer. This was as true in the absence of a promise or assurance as if one had existed. The purpose of the assurance was merely to convince the association that there was a reasonable expectation on the part of the applicant to remain eligible long enough to justify admission to membership. His right to sell to consumers was not taken away or impaired for any definite time or at all. He had the option, without restriction. He could not sell direct to consumers and remain a wholesaler. He must either give up the one or the other. This, however, was not by virtue of his promise or assurance but only because the two things were incompatible with each other, as much so as are black and white.

[5] IV. The fourth class relates to alleged coercion of manufacturers exercised by the association to compel them to confine their sales to exclusive wholesalers. There is little evidence in the record of newly occurring acts of coercion of this kind, on the part of the association or its executive officers, after the date of the decree. The president is shown by the correspondence to have repeatedly disclaimed any effort on the part of the association to interfere with the policy of manufacturers in regard to distribution of their products. The disclaimers probably lose some of their force because of their iteration in stereotyped form. It is clear, however, that the record would

not sustain a conviction upon these specifications, if the association had had no previous history of coercion. The only instances of attempts even to influence manufacturers since the date of the decree, appearing in the record, relate to the matters of abolishing the practice of giving "free deals" and retaining the practice of guaranteeing manufacturers' products in the hands of wholesalers against declines in prices. Other than these, which are discussed hereafter, the transactions between the association and the manufacturers were confined to the furnishing of information to manufacturers by the association on request as to the standing of applicants for the privilege of direct buying from the factory and the sending of the lists of the association to manufacturers. If these acts are to be construed merely as offers of assistance to the manufacturers in carrying out a policy of their own voluntary adoption, sympathized with but in no way induced by the association, they would probably not constitute violations of the decree. If there had been no previous history of such coercion connected with the distribution of the lists and the answering of the inquiries by the association, no other construction would be demanded. It is conceded that at one time the association did issue the lists, then designated "Green Book," as a means of compelling the manufacturers to confine their sales to those whose names appeared on the list; and there is shown no express repudiation of the former policy of coercion, aided by such means, before the date of the decree. The former history of coercion cannot be ignored in interpreting the meaning of the continued distribution of the lists and furnishing information to manufacturers, which occurred after the decree. The association itself is charged with knowledge of all it had done in this respect, and it is difficult to conceive that its present executive officers had no actual knowledge of the previous coercion of manufacturers by the association through these means. The litigation in which the association had been involved, arising out of such acts of coercion, necessarily apprised them of it. Construing the acts of the association in issuing the lists after the date of the decree, in the light of the admittedly improper use to which the "Green Book," their predecessor, had been put before the decree, and without any express repudiation of such misuse by the association or its executive officers at any time, the inference seems a natural one that the association continued the issue of the lists and the furnishing of information in answer to inquiries with knowledge that they would have a like effect upon the manufacturers, who thereafter received them, as they had had before the decree. The issue of the lists and the responses to inquiries with this effect constituted a violation of the act of July 2, 1890 (Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815) and of the final decree in the equity cause, which expressly enjoined attempts to coerce a manufacturer to refrain from selling retailers or whomsoever he pleased.

These acts have an added significance to that of merely assisting a manufacturer in carrying out a policy of his own voluntary adoption and maintenance and partake of the coercion which had concededly accompanied similar acts of the association before the date of the decree. They constituted a deliberate utilization by the association,

after the decree, of the influence over the manufacturers which the previous policy of coercion had gained for it, before and up to the time of the decree. It is not necessary, however, to decide whether such acts, in the absence of any misleading statements as to the effect of the decree, would constitute violations of its terms. There were such misleading statements made to the manufacturers. The association, on October 31, 1911, through its president, addressed to all manufacturers on its mailing list a circular, which purported to be a response to inquiries from certain manufacturers as to whether the association would continue to issue the "Green Book" after the decree, and which stated that it would continue to do so, and that none of the methods, rules of practice, or activities of the association would be affected by the decree. In the light of the previous history of coercion, attending the distribution of the "Green Book," this could only have meant that the manufacturer who sold to unlisted persons would still incur the displeasure of the association. A previous circular addressed to members, but also sent to manufacturers, cannot be said to have corrected the impression received from the circular of October 31, 1911. It was not addressed to manufacturers; it was not the last word of the association but was prior in point of time to that of October 31, 1911, and was not calculated by language to remove the impression naturally created by the circular of October 31, 1911, that the lists, which superseded the "Green Book," would continue to be issued by the association and with like effect as had been the "Green Book." That it was so understood by the manufacturers, members, and those desiring to become members or to be listed, so as to be entitled to direct buying privileges, appears from the evidence tending to show that after the decree, as before, though probably to a less extent, there was a difficulty attending the direct buying from certain manufacturers who were supplied with the lists by the association, unless the name of the buyer appeared upon the lists, and a general impression that being listed was essential to direct buying privileges. This seems a fair deduction from the evidence, even after making allowance for the argument that the manufacturer and his salesmen would naturally be inclined to make the association a scapegoat for their own disinclination to sell the retailer. The record also shows that the president of the association acquired knowledge that this condition of the trade continued after the date of the decree and up to the time of the commencement of this proceeding. It is true that he consistently stated it was not the function of the association to interfere with the manufacturer in his policy of distribution, yet it seems clear that these results of the issuance of the lists became known to him from the correspondence addressed to and received by him, and that he took no steps to correct the impression that had become so general in the trade.

For these reasons, I think the association and its president violated the decree in sending the lists, and information to the manufacturers, under these conditions, and when chargeable with this knowledge. The secretary was also technically guilty, but the evidence shows his acts were ministerial and that he had no direction of the policy of the association.

[**6**] The government also contends that the association, through its president, violated the decree in writing to manufacturers with the purpose, in one instance, to persuade the manufacturer to abandon the policy of giving "free deals," and in another to persuade the manufacturer to continue the policy of guaranteeing the prices of its goods, in the hands of the jobber, against declines. I do not find it necessary to determine the merits of these policies or their effect on prices. The letters written the manufacturers by the association seem to me to contain only legitimate arguments to support the contentions of the association. They contain on their face no hint of coercion or intimidation. It is conceded that in each case they failed to persuade the manufacturer to act as the association desired. While it is true that argument, addressed by a combination to an individual, should be closely scrutinized, in order to detect any veiled threat which may be cloaked under the language of argument, I do not think that such an inference can be fairly drawn from the correspondence relating to the discussion of the policies mentioned. Unless, therefore, it be true that a combination in the form of an association is disabled for that reason from addressing fair and legitimate argument to unorganized individuals, with the purpose of redressing what it considers to be grievances, the decree has not been violated by these acts. The contention of the plaintiff is that the Sherman Act prohibits a combination from addressing even legitimate argument, which may affect interstate trade relations, to an individual engaged in trade of that character. If the principle is correct, it would work the extinction of all trade organizations except for purely social purposes. Their only other valuable function is to redress trade grievances by legal methods. If persuasion by argument, made in good faith and without coercion, express or implied, is not open to them for that purpose, their usefulness is at an end. It will not be denied that there are real advantages to be derived from a proper kind of co-operation, not obtainable by a single individual, unaided. It would be an unfortunate construction of the Sherman Law that would deprive individuals of the benefit and protection to be obtained from such co-operation. The decree permits the organization to continue to exist for other than social purposes; indeed, for all purposes other than those expressly enjoined. This impliedly recognizes that it may have other useful functions which it can legally perform. No authority has been cited that goes to the extent contended for by the government, and I am not prepared to create one.

[**7, 8**] There are two of the many defendants, outside of the association and its president, against whom the evidence of coercion is convincing. These are the defendants H. Lacy Hunt and L. A. Melchers. In each case the defendant attempted to prevent a manufacturer from selling a retailer direct, by a covert threat of the withdrawal of patronage of the writer and the other jobbers of the locality. In the case of Mr. Melchers there is a fair inference from his previous activities in connection with the association, from his furnishing to the manufacturer concerned the list of the association, as his guide in making sales, and from his mention of the local jobbers, that he was using the influence of the association to accomplish his

purpose. In the case of Mr. Hunt the use of the association's name and his position in it as a director, to fortify his influence as an individual, is express and unmistakable. He excuses his act by want of authority as a director to do what he stated in his letter to the manufacturer he would do. While this might exonerate the association, it cannot have that effect as to Mr. Hunt. He was a member, but not a director, when the decree was entered and testifies that he never saw or read it. The evidence of the government tends to show that copies of the decree were sent by registered mail to all members of the association. The defendant Hunt had knowledge of the fact that the association had been enjoined. Before attempting or assuming to act in his capacity as a director, as he did do, it was his duty to inform himself of the effect of the injunction, and, failing to do so, he acted at his peril. Both defendants testify that they had no intention of violating the decree in doing what they did. The decree would be valueless, if those bound by it, and who violate its terms, are permitted to purge themselves by denying the intention to do so or by pleading ignorance of the meaning of its terms.

[9] V. The last class of acts relied upon by the government as constituting contempt are based upon the idea that the association and certain of its officers and members are guilty of contempt under section 725, United States Revised Statutes (U. S. Comp. St. 1901, p. 583) in that they obstructed the administration of justice by writing disparagingly of the litigation and of the effect of the decree to those, whose duty it was to obey it, and so encouraged disobedience of it. The expressions in the letters, which are relied on by the government to sustain these specifications, are largely criticisms of the government and of the litigation instituted by it, but not directly calculated to incite disobedience to the decree, which is the only way in which this court can consider them. Some of the circulars issued by the association, after the entry of the decree, regarding it, had a tendency to mislead, but they have been given consideration, together with the circular of October 31, 1911, in connection with the specifications based on coercion of manufacturers.

My conclusion is that the defendant the Southern Wholesale Grocers' Association is guilty of contempt in violating the decree of the court, and it is adjudged to pay a fine of $2,500 and such part of the costs as were incurred because of the issues found against it; and that the defendants J. H. McLaurin, H. Lacy Hunt, and L. A. Melchers are guilty of contempt in violating the decree of the court, and each is adjudged to pay a fine of $1,000 and such costs as each incurred because of the issues found against them, respectively. All the other defendants are discharged, with their costs.

Decree of Injunction.

"In the Circuit Court of the United States for the Northern District of Alabama.

"The United States of America, Petitioner, v. The Southern Wholesale Grocers' Association et al., Defendants. In Equity. No. 205.

"This cause coming on to be heard before D. D. Shelby and Don A. Pardee, Circuit Judges, and Thos. G. Jones, District Judge, come the United States of America by Oliver D. Street, United States attorney for the Northern Dis-

trict of Alabama, and O. E. Harrison, Special Assistant to the Attorney General, who prosecute in this behalf, and come also the defendants, by their solicitors, Luke E. Wright and Caruthers Ewing, and petitioner moves the court for an injunction in accordance with the prayer of the bill, and by consent of all parties, in open court, it is adjudged, ordered, and decreed as follows:

"(1) That the said defendants the Southern Wholesale Grocers' Association, and all the members of said association, the Southern Wholesale Grocers' Association, a corporation, the McLester-Van Hoose Company, James A. Van Hoose, Robert McLester, the Alabama Grocery Company, S. W. Lee, Joseph H. McLaurin, L. M. Hooper, E. E. Hashagen, C. W. Bartleson, Robert Moore, Thomas C. Davis, B. B. Earnshaw, C. C. Guest, T. H. Scovell, W. T. Reeves, R. A. Morrow, J. H. C. Wulburn, J. D. Faucette, W. A. Scott, and James W. Lee, and each and all of them, their directors, officers, agents, servants, and employés, and all persons acting under, through, by, or in behalf of them or either of them, or claiming so to act, be, and they are hereby, perpetually enjoined, restrained, and prohibited from combining, conspiring, confederating, or agreeing together or with others expressly or impliedly, directly or indirectly, to prevent manufacturers or producers engaged in selling or shipping commodities among the several states and in the District of Columbia from selling such commodities to any person who is not a member of the said the Southern Wholesale Grocers' Association, or who is not listed on the so-called Green Book, published by said association, its officers, and agents, and entitled 'Official List of Wholesale Grocers in the States of Alabama, Arkansas, District of Columbia, Florida, Georgia, Indian Territory, Louisiana, Maryland. Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia,' or any book, pamphlet, or list of like character; and they and each of them be and are likewise enjoined, restrained, and prohibited from publishing, causing to be published, aiding, assisting, or encouraging the publication, distribution, or circulation of any book, pamphlet, or list wherein is contained only the names of wholesale grocers located in the territory embraced by said organization who have announced their intention or agreed, directly or indirectly, expressly or impliedly, to work in harmony with said association.

"They are also enjoined, restrained, and prohibited from publishing or distributing, or causing to be published or distributed, or aiding or assisting or encouraging in the publication or distribution of any list or lists of manufacturers or producers who have, expressly or impliedly, directly or indirectly, agreed to sell only to members of said association, or to persons, firms, or corporations listed in said Green Book, or book, pamphlet, or list of like character.

"(2) That the said defendants and each and all of them, their directors, officers, agents, servants, and employés, and all persons acting under, through, by, or in behalf of them, or either of them, or claiming to so act, be, and they are hereby enjoined, restrained, and prohibited from combining, conspiring, confederating, and agreeing together or with others to fix a price at which any commodity shall be sold, or to coerce manufacturers and producers engaged in selling and shipping commodities among the several states, and in the District of Columbia, to fix a limited selling price at which such commodities are to be sold, and to have such price printed on cards and distributed; and they are hereby enjoined, restrained, and prohibited from printing, causing to be printed, or encouraging or aiding in the printing of such cards or their distribution; and they and each of them are likewise enjoined, restrained, and prohibited from conspiring, confederating, or agreeing together or with others, expressly or impliedly, directly or indirectly, to prevent such manufacturers and producers from selling and shipping commodities to any wholesale grocer who does not maintain the price so fixed and listed; and they and each of them are likewise enjoined, restrained, and prohibited from demanding and receiving from any such manufacturer or producer any rebate, bonus, or emolument of any kind to be paid to any wholesale dealer or jobber for and on account of the fact that he has maintained the limited selling price, and are likewise enjoined, restrained, and prohibited from paying or delivering any such rebate, bonus, or emolument of any kind, directly

or indirectly, to any such wholesale grocer or jobber who has maintained such limited selling price, or demanding or receiving any fine or penalty, directly or indirectly, from any wholesale grocer or jobber engaged in commerce among the several states and in the District of Columbia for and on account of such wholesale grocer or jobber not having maintained said limited selling price.

"(3) That said defendants and each and all of them, their directors, officers, agents, servants, and employés, and all persons acting under, through, by, or in behalf of them, or either of them, or claiming so to act be and they are hereby perpetually enjoined, restrained, and prohibited from conspiring, confederating, or agreeing together or with others, expressly or impliedly, directly or indirectly, to boycott any manufacturer or producer, wholesaler, or jobber engaged in commerce among the several states and in the District of Columbia for and on account of any such manufacturer, producer, wholesaler, or jobber having sold or transported in interstate commerce any commodity to any person, firm, or corporation who is not a member of said association or who does not maintain the said limited selling price or who is not listed in the said Green Book or book, pamphlet, or list of like character, and also from combining, conspiring, confederating, and agreeing together, or with others, expressly or impliedly, directly or indirectly to prevent any person, firm, or corporation who refuses to join said association or who refuses to maintain said limited selling price or who sells commodities direct to the consumer from purchasing such commodities from manufacturers, jobbers, producers, or wholesalers engaged in commerce among the several states and in the District of Columbia, and also from conspiring, confederating, and agreeing together or with others, expressly or impliedly, directly or indirectly, to increase jobbers' profits by increasing prices at which wholesalers and jobbers shall sell any commodity in interstate commerce.

"(4) That said defendants and each and all of them, their directors, officers, agents, servants, and employés, and all persons acting under, through, by, or in behalf of them or either of them or claiming so to act be and they are hereby perpetually enjoined, restrained, and prohibited from conspiring or agreeing together or with others, expressly or impliedly, to do or to refrain from doing anything, the purpose or effect of which is to fix or maintain the price at which any commodity employed or intended to be employed in commerce among the several states and in the District of Columbia shall or should be sold by any manufacturer, jobber, wholesaler, or retailer, or the purpose or effect of which is to hinder or prevent, by intimidation or coercion, any person, firm, or corporation from buying or selling any such commodity wherever, whenever, from and to whomsoever and at whatsoever price may be then and there agreed upon by the seller and purchaser.

"(5) The Southern Wholesale Grocers' Association, its officers and members, and all who shall hereafter become officers and members of said association, are hereby perpetually enjoined and inhibited from doing, or combining or conspiring to do, either or any of said acts. The said association and its officers and members are not restrained from maintaining said organization for social or other purposes than those herein prohibited.

"(6) It is further ordered, adjudged, and decreed that petitioner have and recover of the defendants judgment for the costs in this behalf expended, for which let execution issue.

"The parties have consented to the foregoing; it is ordered entered as the decree of the court.                    DON A. PARDEE, Circuit Judge.
                                   "DAVID D. SHELBY, Circuit Judge.
                                   "THOS. G. JONES, District Judge.

"It is agreed by all parties that the foregoing be entered as the decree of the court.

"October 17, 1911.    O. D. Street, United States Attorney for Petitioner.
                "Luke E. Wright, Attorney for Defendants."