UNITED STATES v. GENERAL
PETROLEUM CORPORATION
OF CALIFORNIA et al.

No. 14149–M Cr.

District Court, S. D. California,
Central Division.

May 20, 1940.

96

M. S. Huberman, Henry McClernan, Laurence P. Sherfy, A. Andrew Hauk, and Charles S. Burdell, Sp. Assts. to Atty. Gen., all of Los Angeles, Cal., for plaintiff.

Roland G. Swaffield, of Los Angeles, Cal., for defendants Aromalene, Inc., and others.

Roland G. Swaffield and J. Howard Edgerton, both of Los Angeles, Cal., for defendants California Oil & Refining Co. and White Star Oil & Refining Co.

Roland G. Swaffield and Hibbard & Kleindienst, all of Los Angeles, Cal., for defendant Century Oil Co.

Francis B. Cobb, of Los Angeles, Cal., for defendant Eagle Oil & Refining Co., Inc.

Roland G. Swaffield and Earl Glen Whitehead, both of Los Angeles, Cal., for defendant El Camino Refining Co.

Roland G. Swaffield and Kenyon F. Lee, both of Los Angeles, Cal., for defendant Estado Petroleum Corporation.

Don S. Irwin, of Los Angeles, Cal., for defendant Exeter Refining Co.

E. S. Williams, of Los Angeles, Cal., for defendant Fair Practices Ass'n.

Proctor K. Perkins, of Los Angeles, Cal., for defendant Fletcher Oil Co., Inc.

Theodore J. Roche, of San Francisco, Cal., and Martin J. Weil, of Los Angeles, Cal., for defendant General Petroleum Corporation of California.

Salisbury, Robinson & Himrod, and Verne E. Robinson, all of Los Angeles, Cal., for defendant Gilmore Oil Co.

F. A. Knight, of Long Beach, Cal., for defendant Hancock Oil Co. of California.

Roland G. Swaffield and Andrews & Kline, all of Los Angeles, Cal., for defendant Kern Oil Co., Limited.

Herbert R. Macmillan, of Los Angeles, Cal., for defendant MacMillan Petroleum Corporation.

Edwin V. McKenzie, of San Francisco, Cal., for defendant Mohawk Petroleum Corporation.

Kirk E. Boone, of Los Angeles, Cal., for defendant Norwalk Co.

Roland G. Swaffield and Edmund Nichols, Jr., both of Los Angeles, Cal., for defendant Olympic Refining Co.

Gordon Lawson and Belmore Goulden, both of Los Angeles, Cal., for defendant Petrol Corporation.

L. R. Martineau, Jr., and Warren Stratton, both of Los Angeles, Cal., for defendants Richfield Oil Corporation and Rio Grande Oil Co., Inc.

Schauer, Ryon & McMahon, Harrison Ryon, and Robert W. McIntyre, all of Santa Barbara, Cal., for defendant Seaside Oil Co.

McCutchen, Olney, Mannon & Greene, and William E. Wright, all of San Francisco, Cal., for defendant Shell Oil Co.

Harold Judson, of Los Angeles, Cal., for defendant Signal Oil Co.

Pillsbury, Madison & Sutro, of San Francisco, Cal., Lawler, Felix & Hall, of Los Angeles, Cal., Oscar Lawler, of Los Angeles, Cal., and Felix T. Smith, of San Francisco, Cal., for defendant Standard Oil Co. of California.

Roland G. Swaffield and Mitchell, Silberberg, Roth & Knupp, all of Los Angeles, Cal., for defendant Sunset Oil Co.

Charles C. Stanley, Gen. Counsel, J. A. McNair, and H. T. Morrow, all of Los Angeles, Cal., for defendant Texas Co.

Robert M. Searls, W. F. Kiessig, and Edmund D. Buckley, all of San Francisco, Cal., for defendant Tide Water Associated Oil Co.

Roland G. Swaffield and L. W. Frankley, both of Los Angeles, Cal., for defendant Triangle Oil & Refining Co.

Brobeck, Phleger & Harrison, and Maurice E. Harrison, all of San Francisco, Cal., and Paul M. Gregg and L. A. Gibbons, both of Los Angeles, Cal., for defendant Union Oil Co. of California.

McCORMICK, District Judge.

On November 14, 1939, an indictment was filed in this court by the grand jury, charging forty-one corporations operating in various units of the petroleum industry functioning among five western states with conspiracy to violate the Sherman Anti-Trust Act, Title 15 U.S.C.A. § 1.

Demurrers have been interposed by twenty-three of the defendant companies. These were extensively argued by government and defense attorneys, and the court after due consideration overruled each demurrer.

The matters now before the court are demands for bills of particulars filed by thirty-nine of the defendant corporations. These omnibus motions comprise in the aggregate nearly three hundred pages of typewritten matter, and if granted in toto would require submission by the prosecution at this time of practically the entire probative factual situation that is embodied within the allegations of the indictment in this case. This result, if obtainable by demands for specificity before plea or before trial in governmental anti-trust proceedings would, we think, enfeeble proper law enforcement in this field of economic order and would have no tendency whatever to promote substantial and impartial justice between the parties. It should, however, be observed in relation to the voluminous and complex motions that are before us that the attorneys for the defendants have, at the arguments, with commendable consideration of economy of time and labor, summarized the more important particulars asked by the various defendants, so that our work has been facilitated to some extent. Nevertheless, we have felt our responsibility in the matter of each movant and have carefully analyzed and compared the demands of each defendant with the respective applicable paragraphs of the indictment, and our conclusions are the composite deductions from the entire record which has been submitted.

As we believe it is merely surplusage to enter into a minute discussion of the office of a bill of particulars in a criminal case, we will briefly state our reasons for refusing to require the government to amplify the allegations of the indictment except as hereinafter ordered. Because the demands of defendants for enlargement of an accusation of a criminal offense cannot be considered or dealt with in the abstract, the applicability of this form of pretrial criminal procedure must be viewed in the light of the specific case as it is laid in the indictment that is immediately before the court for consideration. This is especially true in charges of conspiracy to violate the anti-trust laws of the United States. In such prosecutions, if the indictment, considering the record history of the case, adequately states the alleged unlawful combination or conspiracy so as to enable all accused to clearly understand it, to properly prepare for trial within a reasonable time, and to avoid prejudicial surprise at the trial, a court order requiring detailed enlargement or expansion of the essential ultimate facts sufficiently pleaded may operate to cripple and nullify the established national policy of prohibiting or treating as illegal all contracts or combination of individuals or corporations substantially restrictive of free competition, or to fix prices of commodities, in the channels of interstate business. See United States v. Trenton Potteries Company et al., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann. Cas. 815. Such a course should be carefully avoided by the court.

Authorities have been cited and carefully analyzed by attorneys for the respective parties measuring and defining limits of bills of particulars in criminal conspiracy cases. They have been considered, and our conclusion is that only those which have express relation to anti-trust combinations or comparable offenses pertaining to phases of national economic processes are helpful in the solution of the problem before us. We think this is true not only because of the generic difference in kind between conspiracies which are destructive of the national economic system of free enterprise and those which relate to private property rights or personal security in the social order of the United States, but also because of the statutory differentiation in joint transactions interdicted by the Sherman Act and other conspiracies which require overt acts in addition to the agreement itself. Nash. v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

When consideration is given to the allegations in the indictment and the broad

scope of the Sherman Act as now interpreted by the Supreme Court, it is obvious that the negotiations, transactions and dealings between defendants and others mentioned or referred to in the indictment will be complicated, involved and protracted. And to restrict the evidential processes for duly proving the case as laid in the indictment, which we think would be the inevitable result of granting many of the demands of the defendants, is unwarranted under the record before this court. See Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Kettenbach et al. v. United States, 9 Cir., 202 F. 377; United States v. Pierce et al., D.C., 245 F. 888.

In addition to the informative allegations in the indictment, the submission of material by defendants to the Federal Trade Commission in a lengthy investigation by that body of the subject matter of this prosecution, as well as evidence produced before the special grand jury which brought the indictment at bar, much of the latter now being lodged with the clerk of this court subject to inspection and scrutiny of defendants, shows that a large part of the matter asked for is already known or available to defendants. This situation of course removes any element of necessity as to any features of the case deducible from such sources.

Movants to a great extent in their broad demands for particularization seem to lose sight of an element in anti-trust conspiracy prosecutions which indicates the inherent impossibility, in advance of the actual trial, of presenting the probative entities which establish the necessary agreement or concerted plan condemned by the Sherman Act.

It is quite probable that this case, if tried, will necessarily require considerable time, and no one can deny that the time element in the administration of justice is important, but it is always secondary to a fair trial to all litigants under legal and judicial processes.

The conspiracy charged in the indictment before us is alleged to have been a continuing one, extending over a period of approximately four years and involving multifarious incidents and transactions of many units of an involved and complex industry affecting interstate commercial matters in a substantial area of the United States during that period of time. Such a conspiracy, in the words of the Supreme Court in United States v. Borden Company et al., 308 U.S. 188, 60 S.Ct. 182, 190, 84 L.Ed. 181, "is in effect renewed during each day of its continuance." A wide range of inquiry is therefore imperative, and as is generally the case in conspiracy trials, the gravamen of the offense, if proven to the required degree, will be so established largely by inferences. Direct evidence per se rarely ascends to the degree of sufficiently establishing a conspiracy in any criminal case. It does, when available, supply the necessary bases or foundations upon which guilt of the offense charged may be properly predicated, but it is principally the reasonable deductions and irresistible inferences of the trier of fact arising from such premises that may justify his conclusion of the illegality of the questioned joint purpose. Interstate Circuit v. United States, 306 U.S. 208, at page 221, 59 S.Ct. 467, 83 L.Ed. 610; Eastern States Retail Lumber Dealers Association v. United States, 234 U.S. 600, at page 612, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788. This is particularly true in outlawed price-fixing arrangements between business concerns. In such matters the objective, if attained, is generally reached by the parties through mutual advantages confidentially created rather than through the mechanics of formal contracts or agreements. See United States v. Socony-Vacuum Oil Co., Inc., et al., 60 S.Ct. 811, 84 L.Ed. ——, decided by the Supreme Court on May 6, 1940; United States v. Trenton Potteries Company et al., supra; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136.

The respective corporate entities of the petroleum industry, operative among the several states affected, according to the allegation of the indictment under consideration, are enterprises generally known as major oil companies because of the magnitude and variety of their integrated operations, their respective subsidiaries or affiliates designated as secondaries, smaller oil companies called independents, certain predecessor companies or entities of some of the aforesaid, and two trade associations devoted to affairs of the oil business.

The accusatory part of the charge is contained principally in paragraphs 14 to 21, inclusive, of the indictment, the earlier allegations of the bill being largely de-

scriptive of the specific period of time involved, the detailed identification of the respective defendants and predecessors of certain of them, the definite regional marketing area affected, which is alleged to be known also as the Pacific Coast territory, the producing, refining and transporting of crude petroleum and gasoline in California, the division of the business as between the so-called majors and their secondaries on the one hand and the independents on the other, the manner of distribution of gasoline in the applicable area, and the competitive conditions and potentialities in the sale of gasoline in such territory.

The indictment charges that the defendant major oil companies produce and purchase approximately 86% of all crude petroleum in the market area designated, and further that approximately 95% of all gasoline distributed yearly in the interstate region included in the bill is controlled, manufactured, shipped and sold by the corporations which are made defendants in this case. Paragraphs 14 and 15, respectively, state:

"14. Beginning on or about January 1, 1936, and continuing to the date of the presentation of this indictment, and in the Southern District of California and within the jurisdiction of this Court, defendants and certain persons hereinafter mentioned and other persons to the grand jurors unknown, well knowing all the foregoing facts, have combined and conspired together for the purpose of artificially raising and maintaining prices of gasoline marketed in interstate commerce in the Pacific Coast territory, and, as intended by them, have artificially raised said prices and have maintained said prices at artificial and non-competitive levels. In so doing, defendants have then and there engaged in an unlawful combination and conspiracy in restraint of trade and commerce in gasoline among the several states of the United States in violation of Section 1 of the Act of Congress of July 2, 1890, known as the Sherman Anti-Trust Act. Said combination and conspiracy is hereinafter more particularly described.

"15. For the purpose of effectuating said unlawful combination and conspiracy, defendants have employed divers means and methods, including those alleged in paragraphs 16 to 21, inclusive, hereinbelow contained, and other means and methods to the grand jurors unknown."

It is not contended that epitomizing the conspiracy alleged against defendants in the two paragraphs of the indictment just quoted obviates the necessity of further particularization by the government upon the demand of an accused for greater specificity in the interests of a fair trial.

The indictment before us, however, does not stop in its informative matter by merely generalizing the accused concerted business relations of the defendants. In subsequent paragraphs of the indictment the times defining the commencement and continuance by the defendants of the alleged conspiracy in restraint of interstate trade and commerce in gasoline are specified with greater certainty; in fact, certain acts of defendants expressly charged to have been component parts of and in furtherance of the accused concerted program summarized in paragraphs 14 and 15 are recited with precision as to date and place of meeting by certain defendants for the purpose of conforming to prices for gasoline which it is alleged had been established by other defendants, coercive and restrictive ways to bring about noncompetitive prices in interstate gasoline sales are alleged, specific methods are claimed to have been employed, specific entities acting at specific periods of time are definitely described, and documentary instrumentalities used to impart and convey to defendants information deemed necessary and advisable to safeguard and carry out the alleged gasoline price fixing combination charged against the defendants are clearly stated.

The concluding paragraph of the indictment alleges specific acts by specific defendants claimed to have taken place within the Central Division of this judicial district and to have been operative of the alleged price-fixing agreement.

It is true that the names of witnesses whom the government may be required to call in order to prove allegations of conspiracy or concerted action are not disclosed, nor are evidential mechanics which may be required at the trial expressly submitted. The weight of authority is against requiring the government to furnish to defendants in conspiracy cases the names of witnesses or the evidence upon which it will rely in the trial of the case. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Rubio v. United States, 9 Cir., 22 F.2d 766; Robinson v. United States, 9 Cir., 33 F.2d

238; United States v. Dilliard, 2 Cir., 101 F.2d 829; United States v. Pierce et al., supra.

■ We believe that the defendant companies' executives, attorneys and agents are adequately apprised of what the government charges in this case to be the unlawful combination, by factual allegations in the indictment ·itself and by the situation known or available to them, mentioned earlier in this memorandum.

Since the decision by the Supreme Court on May 6, 1940, in United States v. Socony-Vacuum Oil Co., Inc., et al., 60 S.Ct. 811, 843, 84 L.Ed. ——, many of the particulars asked by defendants in this case relate to matters declared by the Supreme Court to be immaterial to prosecutions for combinations to fix prices of gasoline in the channels of interstate trade.

In this recent decision the court said:

"The reasonableness of prices has no constancy due to the dynamic quality of the business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system. But the thrust of the rule is deeper and reaches more than monopoly power. Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike. * * *

"As we have indicated, the machinery employed by a combination for price-fixing is immaterial.

"Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se. Where the machinery for price-fixing is an agreement on the prices to be charged or paid for the commodity in the interstate or foreign channels of trade, the power to fix prices exists if the combination has control of a substantial part of the commerce in that commodity. Where the means for price-fixing are purchases or sales of the commodity in a market operation or, as here, purchases of a part of the supply of the commodity for the purpose of keeping it from having a depressive effect on the markets, such power may be found to exist though the combination does not control a substantial part of the commodity. In such a case that power may be established if as a result of market conditions, the resources available to the combinations, the timing and the strategic placement of orders and the like, effective means are at hand to accomplish the desired objective. But there may be effective influence over the market though the group in question does not control it. Price-fixing agreements may have utility to members of the group though the power possessed or exerted falls far short of domination and control. Monopoly power (United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325) is not the only power which the Act strikes down, as we have said.· Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act. The indictment in this case charged that this combination had that purpose and effect. And there was abundant evidence to support it. Hence

the existence of power on the part of members of the combination to fix prices was but a conclusion from the finding that the buying programs caused or contributed to the rise and stability of prices."

There are some matters contained in the indictment which in the interests of necessary clarification, and to forestall prejudicial surprise at the trial, we think should be amplified pursuant to demands of defendants. These are indicated relative to the different paragraphs of the indictment and are ordered to be supplied to each defendant which the files show has asked for them, unless in the interest of economy duplicates are waived. It is to be understood that the particulars ordered to be furnished shall be available to and applicable to all defendants. The particulars ordered shall be furnished to defendants respectively at least thirty (30) days prior to the day set for the trial of this case.

In relation to and concerning the allegations in paragraph 5 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 1 of defendant The Texas Company, as follows: "Whether it is claimed that William C. McDuffie, as receiver of Richfield Oil Company of California, until October 8, 1936, and thereafter William C. McDuffie, as reorganization trustee of Richfield Oil Company of California (in the indictment referred to as predecessor companies of Richfield) engaged in the alleged conspiracy."

In relation to and concerning the allegations in paragraph 9 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 1(b) of defendant Union Oil Company of California, as follows: "In what sense the words 'practically all' are used in said paragraph of the indictment and to what percentages of the total do said words refer." Answer by plaintiff is also ordered pursuant to demand number 2(a) of defendant Union Oil Company of California, as follows: "Whether it is charged that defendant majors jointly produced the percentage referred to, or produced such percentage in the aggregate."

In relation to and concerning the allegations in paragraph 10 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 1(a) of defendant Union Oil Company of California, as follows: "Whether it is charged by the use of the word 'together' that de-

fendant majors and defendant secondaries jointly did the acts referred to in said allegation, or whether it is intended by the word 'together' to indicate that the acts referred to were those of the defendant majors and defendant secondaries in the aggregate." Answer by plaintiff is also ordered pursuant to demand number 2(a) of defendant Union Oil Company of California, as follows: "Whether it is charged by the use of the word 'together' that defendant independents jointly did the acts specified, or whether by the use of the word 'together' it is intended to charge what is the aggregate effect of their activities."

In relation to and concerning the allegations in paragraph 13 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 13.1 of defendant Sunset Oil Company, as follows: "A statement of the identity of the persons, firms and corporations, by name, or description sufficient to identify if the name is unknown, embraced within the phrase 'other independent refiners' as used in said paragraph."

In relation to and concerning the allegations in paragraph 14 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 35 of defendant Richfield Oil Corporation, as follows: "The names of the 'certain persons hereinafter mentioned' who are alleged in said paragraph 14 to 'have combined and conspired together'."

In relation to and concerning the allegations in paragraph 16 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 16.1 of defendant Sunset Oil Company, as follows: "A statement of the names and identity of the persons, firms and corporations embraced within the phrase 'other independent refiners not made defendants herein'."

In relation to and concerning the allegations in paragraph 18 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 1(a) of defendant Union Oil Company of California, as follows: "Who are the 'other independent refiners not made defendants herein', and 'said other independent refiners', referred to in said allegation."

In relation to and concerning the allegations in paragraph 20 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 1(f) of defendant Union Oil Company of

California, as follows: "Who are the 'others' referred to therein as having used said 'market surveys' and 'gasoline purchases' compilations for the purpose and with the effect referred to therein."

In relation to and concerning the allegations in paragraph 21 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 21.1 of defendant Sunset Oil Company, and demand number 2(e) of defendant Union Oil Company of California, as follows: "A statement of the identity of the 'other independent refiners not made defendants herein' referred to in said paragraph; a statement of the 'others', by name or description, referred to in said paragraph."

In relation to and concerning the allegations in paragraph 22 of the indictment, answer by plaintiff is ordered as aforesaid pursuant to demand number 32 of defendant Fair Practices Association (Petroleum Products), a California corporation, as follows: "Who are the 'other independent refiners' alleged in paragraph 22 of said indictment."

Other than as hereinbefore ordered, the demands of each defendant for further particulars herein are denied. Exceptions allowed each defendant as to demands not allowed; and exceptions allowed plaintiff to each ruling ordering further particulars as aforesaid.