UNITED STATES v. GENERAL ELECTRIC CO. et al.

District Court, S. D. New York.
April 18, 1941.

Charles H. Weston and Ernest S. Meyers, Sp. Assts. to the Atty. Gen. (Thurman Arnold, Asst. Atty. Gen., of counsel), for the United States.

John Lord O'Brian, of Buffalo, N. Y. (Quincy D. Baldwin and Slee, O'Brian, Hellings & Ulsh, all of Buffalo, N. Y., of counsel), for General Electric Company and others.

LEIBELL, District Judge.

Two motions have been made by the defendants (excepting Krupp, which has not been served); (1) to quash Count Two of the indictment or, in the alternative, to compel the government to elect between Counts One and Two; and (2) for a bill of particulars.

The indictment contains three counts, but the third (a violation of the Wilson Tariff Act) is not directly involved on this motion. Counts One and Two charge a violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, from which I quote as follows: "§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. * * * "

In the first count a conspiracy is charged between General Electric, its subsidiary Carboloy Company, Fried. Krupp Aktiengesellschaft a German corporation, and the individual defendants who were officers of General Electric or Carboloy Company.

For many years General Electric, through Carboloy, made, distributed and sold, in interstate and foreign commerce, hard metal compositions in the form of blanks, tips and nibs, and tools and dies made therefrom. Krupp likewise was engaged in that business and exported its German made products to the United States, where they were received by Krupp's two corporate agents, for ultimate resale in interstate commerce at prices fixed by said agents.

Prior to November 5, 1928, General Electric and Krupp each owned interests in certain American patents and patent applications, concerning which disputes had arisen. Negotiations were entered into with a view to settling these differences and a price fixing agreement resulted for United States territory.

Prior to May 1, 1936, General Electric and Carboloy contemplated exporting their hard metal products in competition with Krupp. On April 22, 1936, General Electric and Krupp entered into an agreement pursuant to which Krupp discontinued the sale of its hard metal compositions and dies in the United States and received instead a royalty on what General Electric and its subsidiary sold here. General Electric agreed not to export its hard metal products, except with the specific consent and approval of Krupp. Since 1938 Carboloy has manufactured the same products which Krupp ceased to export to this country in 1936 and 1937, and has distributed and sold them in interstate trade.

Count One of the indictment sets forth in some detail the conspiracy "in restraint of interstate trade and foreign commerce in hard metal compositions". The gist of it is that General Electric and Krupp executed, on November 5, 1928, a fifteen-year agreement, the purpose of which was to fix high and unreasonable prices for hard metal compositions and products in interstate trade. By its terms General Electric was empowered to fix minimum prices for the sale of the hard metal compositions, etc., in the United States, and agreed to compel its patent licensees to observe them. Krupp agreed to be bound by the prices so fixed and not to sell below those levels in this country. In consideration, a fund was created to pay royalties to Krupp. The conspiracy, of course, is stated in general terms, but this written agreement of November 5, 1928, is the basis of it and is set forth as the first "means" whereby the conspiracy was effectuated.

There are alleged certain other means and methods, to wit: A contract between General Electric and Carboloy whereby the latter became the particular instrumentality through which the hard metal field was exploited and General Electric performed its part of the bargain with Krupp; the granting of certain licenses to other manufacturers in this country, and the manner in which the licensees were limited and the means whereby the industry was "policed" and the minimum prices enforced. As a result the price of hard metal compositions was increased almost ten fold.

As an additional "means" for effectuating the conspiracy pleaded in Count One, it is alleged that "for the purpose of ob-

taining for Carboloy and its licensees the entire United States market for hard metal compositions", a further agreement was entered into between the same parties, on or about April 23, 1936, whereby the 1928 contract was "amended". By the amendment it was agreed that Krupp would no longer import its products into the United States and General Electric would not export. The consideration to Krupp was increased to 10% of all sales in the United States by Carboloy and its licensees, and General Electric agreed that no more licenses would be issued. At the same time General Electric agreed to make suitable terms to compensate the two United States import agents of Krupp.

The results of this amendatory agreement are then averred: A new agreement between General Electric and Carboloy to conform to the above; the fact that since that date Krupp has not exported to this country, and General Electric has not exported, except with Krupp's consent; that General Electric has continued to fix prices, and that Carboloy and its licensees continue to sell at those prices; and that Carboloy has thus gained an unfair advantage over the field.

Count Two of the indictment contains by reference all of the introductory matter (paragraphs 1 to 19 of Count One). For the balance it is almost a counterpart of Count One, beginning with the execution of the April, 1936, agreement. The difference is, whereas in Count One this April, 1936, contract is set forth as a "means" of effectuating the conspiracy begun in 1928, in Count Two there is an attempt to allege it as a new and distinct conspiracy.

I. It is the defendants' contention that Count Two should be quashed, claiming that the conspiracy charged therein is but a part of that charged in Count One and is not a new and distinct violation of the law; that the same means and methods asserted as having effectuated conspiracy number two, are set forth also as among the methods employed in conspiracy number one. Defendants' main contention is that the same acts are alleged as separate conspiracies, whereas at the most they constituted but a single conspiracy; that each alleged separate conspiracy is set forth in a separate count, and that the defendants are thus placed in double jeopardy for a single offense.

A comparison of Counts One and Two reveals that the second is completely included within the first, and that the language of the second is the same as the first with some minor exceptions.

In paragraph 22 of Count One it is alleged that the conspiracy was in restraint of "interstate trade and foreign commerce". In paragraph 23 it is stated more particularly that the purpose of the conspiracy was to " * * * fix * * * prices * * * in interstate trade and commerce."

Paragraphs 27 and 29, in Count Two (corresponding to paragraphs 22 and 23 of Count One) detail the alleged second conspiracy. Paragraph 27, except for the date on which the conspiracy is alleged to have commenced, is a repetition of paragraph 22. In paragraph 28 the purpose of the conspiracy is set forth: "to suppress and limit competition between them in interstate trade and foreign commerce" by agreeing that Krupp would not import and General Electric would not export hard metal compositions.

Paragraphs 25 and 30 compare the effects of the two conspiracies alleged. They are alike in that both are alleged to have (1) exacted high, excessive and noncompetitive prices, (2) discouraged the use of hard metal compositions in the United States, (3) prevented and restrained trade and competition in interstate trade and foreign commerce; and (4) both are asserted to have directly, substantially and unreasonably restrained interstate trade and foreign commerce, but as to Count Two this restraint is alleged to be in respect to exports and imports.

■ It may be conceded that the effect of the April, 1936, amendatory agreement was to broaden the scope of the plan and make the position of General Electric and Krupp more secure in their respective spheres. But that alone would not create a new crime when it is apparent that it was but a continuation of the original conspiracy itself illegal.

■ A contract in restraint of interstate and foreign commerce is condemned in Section 1 of the Sherman Anti-Trust Act. So is a conspiracy in restraint of such trade. The contract is not necessarily the same as the conspiracy. In United States v. Kissel, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L. Ed. 1168, the Court said: "A conspiracy in restraint of trade is different from and more than a contract in restraint of trade. A conspiracy is constituted by an agreement it is true, but it is the result of the

agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract, but is a result of it. * * * A conspiracy is a partnership in criminal purposes."

■ Furthermore, it is clear that a conspiracy of the nature here involved is a continuing affair. As the court stated in United States v. Borden Co., 308 U.S. 188, 202, 60 S.Ct. 182, 190, 84 L.Ed. 181: "A conspiracy thus continued is in effect renewed during each day of its continuance."

See, also, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 227, 60 S.Ct. 811, 84 L.Ed. 1129; and Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614.

The conspiracy in Count One is alleged (paragraph 1) to have "continued" from November 5, 1928, to the date of indictment, August 30, 1940. Paragraph 1 of Count One is incorporated in the opening statement of Count Two by reference, yet in paragraphs 27 and 28 of Count Two it is alleged that beginning about April 23, 1936, and continuing to the date of the indictment the defendants were engaged in a conspiracy in restraint of interstate trade and foreign commerce.

In Powe v. United States, 5 Cir., 11 F.2d 598, the indictment, in Count One, charged a conspiracy to commit a single offense in violation of the Prohibition Act. 27 U.S. C.A. § 1 et seq. In Count Two a continuous conspiracy was alleged and one of the "means" for effectuating it was the offense charged in Count One. The court stated that the government could not split up one conspiracy and make several conspiracies out of it, citing In re Snow, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658; and Norton v. United States, 5 Cir., 295 F. 136. These principles are enunciated also in Ex parte Rose, D.C., 33 F.Supp. 941; Short v. United States, 4 Cir., 91 F.2d 614, 112 A.L.R. 969, and cases therein cited. I cannot see that the situation in the case at bar differs materially from those decisions.

■ As was said in Norton v. United States, supra [295 F. 137]: "The fact that the conspiracy contemplated numerous violations of law as its object does not make the indictment duplicitous. The gist of the offense is the conspiracy, and it is single, though its object is to commit a number of crimes."

In the instant case the April 23, 1936, agreement is referred to as "amendatory" of the earlier one of November 6, 1928, giving further weight to the conclusion that the second agreement is but a continuation of the former agreement in a modified form, and is but part and parcel of the single conspiracy.

The prosecution urges, as a ground of distinction, that Count One relates to price-fixing in the domestic market, whereas in Count Two both interstate and foreign commerce are affected and the latter conspiracy is effective to eliminate all competition between General Electric and Krupp. But Count One charges that one of the effects of the conspiracy was to restrain both interstate and foreign commerce. It is obvious that the restraint placed upon Krupp's imports by the price-fixing arrangement in Count One had some effect on foreign commerce. And conversely, the elimination of Krupp's imports from the United States market as alleged in Count Two had a direct bearing on the price-fixing arrangement, because it gave General Electric even greater control over the United States market than it had before.

The agreement of November 5, 1928, by itself, or said agreement as modified by the agreement of April 23, 1936, or the new provisions alone of the April 23, 1936, agreement, any one of the three might properly form the nucleus around which a conspiracy could develop and have its being. But we have no such different and separate pleading in Counts One and Two of the indictment herein. The only difference in the two appears to be the stress or emphasis placed on a particular phase, result or objective of the single conspiracy in restraint of interstate and foreign commerce; in Count One the emphasis is on the price-fixing phase or objective; in Count Two it is on the limitation of the imports and exports.

United States v. MacAndrews & Forbes Co., C.C., 149 F. 836, to which the government refers, is distinguishable. There count one charged a conspiracy under Section 1 of the Sherman Anti-Trust Act 15 U.S.C.A. § 1. Count two charged an attempt to monopolize, under Section 2 of the Act, 15 U.S.C.A. § 2. These are two separate and distinct crimes. In this case both counts allege a violation of Section 1 of the Act, by way of a conspiracy.

■ It is further argued that the offenses charged in the two counts are different because the 1936 agreement charged in Count Two as violative of Section 1 of

the Act is, in Count One, "not so charged but is recited merely as a means by which the original conspiracy was effectuated." This argument fails to distinguish between "contract" and "conspiracy". The charge here in both counts is conspiracy—not the illegal contracts in restraint of trade. The individual defendants and Carboloy were not parties to the contracts of November 5, 1928, and April 23, 1936, only Krupp and General Electric were parties to those contracts. There is no count limited to the contracts and naming only the parties to the contract. United States v. Kissel, 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168. Nor have we here an indictment charging in one count a conspiracy to commit an offense against the United States, 18 U.S.C.A. § 88 and another count charging a substantive offense which the conspiracy had as its objective. United States v. Illinois Alcohol Co., 2 Cir., 45 F.2d 145. Here we have a conspiracy under the Sherman Act, Section 1, 15 U.S.C.A. § 1, as the charge of both Counts One and Two.

My attention has been directed to Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 477, 83 L.Ed. 610. There it was held that if the parties to an unlawful continuous conspiracy subsequently and separately enter into agreements in furtherance thereof, not only the original conspiracy but each separate contract is a violation of Section 1 of the Sherman Act and may be separately enjoined. That was a suit in equity and the relief sought was an injunction. The contracts were not held to be separate conspiracies, but rather ready instruments by which the control and restraint were exercised. The last paragraph of the court's opinion makes the distinction:

"We think the conclusion is unavoidable that the conspiracy and each contract between Interstate and the distributors by which those consequences were effected are violations of the Sherman Act and that the District Court rightly enjoined enforcement and renewal of these agreements, as well as of the conspiracy among the distributors."

The government also argues that the decision in United States v. Socony Vacuum in the District Court for the Western District of Wisconsin is controlling here. I have examined the indictment in that case which is attached to the brief. It appears that motions were made to compel the government to elect between the three counts pleaded, on the ground that each count charged the same conspiracy. The court denied the motions, but without opinion, so that I am left to conjecture the reasons which motivated the decision. The indictment in the Socony case is similar in form to the present one. The considerations involved on the motions, however, are quite different. There an election was sought. Here the defendants seek to have Count Two quashed and only in the alternative do they seek an election.

On the situation thus presented I do not believe a defendant should be permitted to select one of the two counts and have it dismissed on motion before trial. The safer course would be to leave the defendants to their remedies at the trial, when the government's case is in. Accordingly, I deny defendants' motions to quash Count Two of the indictment.

II  Under the established rules of pleading an indictment may contain in separate counts the same charge pleaded in different ways in order to obviate any fatal variance in the proof. Dealy v. United States, 152 U.S. 539, 542, 14 S.Ct. 680, 38 L.Ed. 545.

The government contends that "even if it be assumed arguendo that Counts One and Two charge the same offense, defendants' motion to require the government to elect should be denied". I am of the opinion that both said counts do charge only one offense, a conspiracy to restrain interstate and foreign commerce in violation of Section 1 of the Sherman Anti-Trust Act. But I agree with the government's contention that it should not be required to elect in advance of trial on which of said counts it intends to proceed. Election under certain circumstances may defeat the ends of justice. Steinhardt Bros. & Co. v. United States, 2 Cir., 191 F. 798. The defendants in this case will not be prejudiced by a denial of their motion to compel an election. They may renew their motion at the trial. Clifton v. United States, 54 App.D.C. 104, 295 F. 925, 926. See, also, Sisson v. United States, 54 App.D.C. 189, 295 F. 1010; Terry v. United States, 4 Cir., 120 F. 483; United States v. Howell, D.C., 65 F. 402.

III  The office of a bill of particulars is to inform the accused of the nature of the charge with sufficient definiteness to plead his acquittal or conviction in bar of a later prosecution for the same offense, to enable him to prepare for trial, or to prevent surprise. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.

Ed. 545; United States v. Gouled, D.C., 253 F. 239. Analysis of the indictment, in the light of the demand made here, reveals without doubt that the defendants are sufficiently informed of the nature of the charges laid against them for every purpose enumerated above.

The remarks of the court in United States v. General Petroleum Corporation, D.C., 33 F.Supp. 95, 97, are particularly pertinent to this case:

"Authorities have been cited and carefully analyzed by attorneys for the respective parties measuring and defining limits of bills of particulars in criminal conspiracy cases. They have been considered, and our conclusion is that only those which have express relation to anti-trust combinations or comparable offenses pertaining to phases of national economic processes are helpful in the solution of the problem before us. We think this is true not only because of the generic difference in kind between conspiracies which are destructive of the national economic system of free enterprise and those which relate to private property rights or personal security in the social order of the United States, but also because of the statutory differentiation in joint transactions interdicted by the Sherman Act and other conspiracies which require overt acts in addition to the agreement itself. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

"When consideration is given to the allegations in the indictment and the broad scope of the Sherman Act as now interpreted by the Supreme Court, it is obvious that the negotiations, transactions and dealings between defendants and others mentioned or referred to in the indictment will be complicated, involved and protracted. And to restrict the evidential processes for duly proving the case as laid in the indictment, which we think would be the inevitable result of granting many of the demands of the defendants, is unwarranted under the record before this court. See Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Kettenbach et al. v. United States, 9 Cir., 202 F. 377; United States v. Pierce et al., D.C., 245 F. 888."

In a prosecution under the Sherman Act, overt acts need not be pleaded or proved, other than the conspiracy itself. Nash v. United States, 229 U.S. 373, 33 S. Ct. 780, 57 L.Ed. 1232; Mercer v. United States, 3 Cir., 61 F.2d 97. The indictment here sets forth in considerable detail, not the conspiracy alone, but numerous overt acts, thus exceeding the detail required by law. In dealing with a similar situation the court, in United States v. Gouled, D.C., 253 F. 239, 242, stated:

"The fact that the indictment, in much greater detail than the law requires, sets up the procedure which the conspirators agreed to adopt, and with far greater minutiæ than necessary sets out the series of overt acts by which the conspiracy was to be effected, cannot enlarge the rights of the defendant."

Examination of the demand shows that in practically all instances the items requested relate to the overt acts alleged in the indictment. Further particularization as to those matters, which themselves are evidence, would result in the disclosure of more evidence and, as is contended by the government, would unduly hamper and restrict their case. That is not the purpose of a bill of particulars. Mulloney v. United States, 1 Cir., 79 F.2d 566; United States v. Pierce, D.C., 245 F. 888. Defendants' motion for a bill of particulars is denied.

Submit orders on notice and in accordance with this opinion.